O. V. BOND, Plaintiff-Appellee,

v.

TRANSAIRCO COMPANY et al., Third Party Defendants-Appellants,

B. W. Johnson et al., Defendants-Appellees,

Sonny Hughes et al., Defendants-Third Party Plaintiffs-Appellees.

No. 74–1119.

United States Court of Appeals, Fifth Circuit.

June 13, 1975.

Donald V. Organ, Thomas M. Young, New Orleans, La., for Market Ins. and Transairco.

Robert M. Contois, James W. Newman, Jr., New Orleans, La., for Transairco.

Frank P. Letellier, James A. Wysocki, Henry L. Klein, Peter C. Rizzo, New Orleans, La., for Bond.

Wood Brown, III, New Orleans, La., for Hughes, Johnson and others.

Before GOLDBERG and RONEY, Circuit Judges, and GROOMS, District Judge.

GROOMS, District Judge:

This is an appeal by Transairco, Inc. and its insurer, Market Insurance Company, from judgments on verdicts in favor of appellees O. V. Bond and B. W. Johnson, et al., third party defendants. Three issues were asserted: defective material, defective design, and failure to provide proper maintenance information. The court directed a verdict for the defendants on the issue of defective material. The jury found for them on defective design, and against them on failure to provide proper maintenance information. On the trial to assess damages there was a verdict for Bond of $185,000.00 "for all damages other than any inflation or cost of living increase," and a separate verdict of $40,000.00 "to cover inflation or cost of living increase."[1]

The threshold question is that of the sufficiency of the evidence both as to initial breach of duty in failing to provide proper maintenance information and as to proximate cause.

Appellant, Transairco, Inc., manufactured and assembled a "Skyworker" basket type crane, commonly called a "cherry picker." The Crane # H–1671 was sold to its Shreveport dealer on October 12, 1965. The dealer immediately sold it to the W. S. Young Construction Company, a power line contractor, who used it

1. See Johnson v. Penrod Drilling Company, 5 Cir., 510 F.2d 234.

until it was sold to Highlines Construction Company in August 1969.

On January 20, 1970, appellee, a power line worker, was seriously injured in an accident while using the unit. Appellee was occupying the basket of the crane when the entire basket and boom assembly fell from its elevated position due to the ram separating from the block of the lower boom hydraulic assembly.

The ram is a cylindrical chrome plated rod two inches in diameter and three feet long. It is threaded for a distance of one and three-eighths (1⅜) inches. The threaded end screws into a machined block with a one-eighth (⅛) inch slot on its face. The slot permits an Allen screw to compress the block against the ram for a tight fit.

The assembly which failed is no more than a rod screwed into a block with a compression screw. Appellee's expert Peyronnin testified that most of the units involved in this sort of operation have a connection "just exactly like this one or basically like this one," and added that it was "a standard screw system or assembly." It is variously referred to in the evidence as "a common type of connection for a boom assembly," as "not a complicated part," or "unusual type of arrangement," and "as something that mechanics would be aware of." There is nothing sophisticated nor "unique," as appellee chooses to describe it.

The owners had no program for periodic or scheduled maintenance or inspection of the unit. It was only when something went wrong that the involved unit or part was given attention.

The block had a safety factor of 4½ to 5 and was more than adequate when properly maintained. The size of the rod, the material, and the threads were adequate in accordance with accepted engineering principles. There had been a prolonged failure to keep the joint tight. This resulted in the wearing of the threads on the bolt and in the block. In an apparent and belated attempt to correct the condition the block had been subjected to blows from a hammer, marks of which were clearly visible. Such treatment had the effect of deforming the surface and at least partially closing the slot and prevented the tightening of the joint by the Allen screw. Someone had, without success, used a hacksaw or other cutting tool to reopen the slot so that a tighter fit could be made. The condition of the block could have been easily determined by inspection and was obvious. One of the mechanics testified that before the accident that he reported to his shop foreman that the ram and block were in a dangerous condition and he recommended that the unit be replaced.[2]

It was the impression of one of the experts that the block was "one of the most abused pieces of equipment" that he had seen.

Appellee does not dispute "improper maintenance," but contends that improper maintenance proximately resulted from a failure to provide proper maintenance information.

The maintenance manual contains a maintenance schedule addressed to maintenance at daily, weekly, monthly and annual intervals. The annual servicing specifically calls for an inspection of "all fittings, and structural bolts for tightness." Neither Peyronnin, nor Boyd and Mayes, who were charged with the main-

---

2. The report of the Pittsburgh Testing Laboratory was:

"In our opinion, the following conclusions can be made from this examination:

1. Failure of the threads was due to thread pullout (sheer) but the time of the thread failure appears to be indeterminate, that is, there is good evidence as shown by the hammered 'front' face and the hacksaw-like slitting as well as the presence of the pipe wrench marks on the shaft that an attempt was made to tighten the shaft in an unworkmanlike manner as we would expect after the shaft was in service. There is nothing to preclude that the shaft was not stripped at that time.

2. The presence of upset threads on the 'top' face of the nut (see Figure 1A) indicates that the shaft was loose and free to deform the thread run out area as we would expect if the threads of the shaft already had been stripped and the shaft was free to bend."

tenance of the unit and who knew of the need for maintenance, gave testimony on the lack of or need for maintenance information. Neither Denson nor Hoff, experts for appellant, indicated that the instruction manual was inadequate. On the contrary, Denson testified, when asked if he saw any instructions concerning that portion of the assembly, that:

"Annually the manufacturer recommends that all the fittings and structural bolts be checked for tightness. I would include this in being one of the fittings to check."

And Hoff when asked if he knew what the manual recommended in connection with the tightness of the fittings, testified:

"A. The recommended standard is as quoted in the book, would be to maintaining them in a tight condition.

Q. And is there anything else that you could—that you could reasonably tell a mechanic about—about that, or is there anything else that there is necessary to tell a mechanic?

A. There shouldn't be anything else to tell a mechanic except to maintain good solid tight fittings, tight bolts, any fastenings . . ."

Obviously referring to the testimony of Denson and Hoff, the court stated that it would let the issue go to the jury, commenting:

"I think one interpretation of the evidence might well be two witnesses said it was not necessary to say certain things in the manual. The jury may believe differently . . ."

■ The burden of proof was on the plaintiff to prove by a preponderance of the evidence that the appellant failed to provide adequate maintenance information. The disbelief of those witnesses would not supply evidence otherwise lacking in respect to the claimed failure. Nor would the failure to maintain the unit, without a showing that such failure proximately resulted from inadequate maintenance information, supply such evidence. This brings us directly to a determination of the sufficiency of the evidence from the record.

■ The owners of the assembly followed no maintenance schedule. Maintenance appears to have been entirely based upon the practice of fixing only those defects which surfaced during use.

There was no evidence that maintenance was based upon the manual or that anyone relied upon it for maintenance information or was misled by it. There was no evidence that the unit needed any maintenance beyond that which was called for in the manual. There was no testimony by expert or lay witness that the maintenance instructions, including the advice that all joints should be examined once a year for tightness, were insufficient, and that such insufficiency was a proximate cause of the accident.

The uncontradicted evidence clearly reflects that the maintenance requirements for the assembly were obvious from inspection and that both Boyd and Mayes knew without reference to the manual that maintenance was required and needed and that a tight fit had to be maintained at the joint, as called for by the manual. The tendency of the evidence was that the manual would not have been followed in any event.

■ The evidence at length deals almost entirely with the issue of defect in design. There was little evidence as to the issue under review but such as it was does not upon a careful analysis establish liability within the guidelines of Boeing Company v. Shipman, 5 Cir., 411 F.2d 365, 374–375.

It is regrettable that the lack of maintenance of the assembly resulted in the serious injuries to appellee, but liability cannot be visited upon those who were not charged with the maintenance of the assembly nor contributed to the lack of it.

Appellee Bond was not entitled to a recovery and the jury should have been directed to find a verdict for the appel-

lants. The court should have corrected its error by granting a judgment N.O.V. The judgment of the court is, therefore, reversed for an entry of judgment not inconsistent with this opinion. The judgment will be affirmed as to the third party appellees.

Reversed as to appellee Bond.

Affirmed as to third-party appellees.