565 P.2d 181

**Barrett ROGERS, Appellant,**

v.

**UNIMAC COMPANY, INC., Appellee.**

No. 12842.

Supreme Court of Arizona,
In Banc.

April 25, 1977.

Barber, Haralson & Kinerk, P. C. by Dale Haralson, Tucson, for appellant.

Lesher, Kimble, Rucker & Lindamood, P. C. by William Kimble, Tucson, for appellee.

Brief Amicus Curiae of Arizona Trial Lawyers Assn. by Donald S. Klein and Frederick S. Klein, Tucson.

CAMERON, Chief Justice.

On 30 November 1972, Barrett Rogers, a nineteen year old employee of the Country Club Car Wash in Tucson, Arizona, fractured his arm, wrist and hand in several places when his arm was caught in the spinning extractor basket of a Unimac 202 commercial washer-extractor. He brought an action against Unimac Corporation, manufacturer of the appliance, on the theory of strict liability in tort. From the granting of the defendant's motion for a directed verdict, the plaintiff appeals seek-

ing to have the judgment reversed and the case remanded for a new trial. This court has jurisdiction pursuant to Rule 47(e)(5), Rules of the Supreme Court, 17A A.R.S.

We must consider the following questions on appeal:

1. Did the plaintiff have to show that the alleged defect made the product unreasonably dangerous?

2. Did the plaintiff present sufficient evidence that the design of the Unimac 202 extractor was defective for lack of a lid lock?

3. Did the plaintiff present sufficient evidence that the Unimac was defective because the defendant manufacturer failed to provide adequate maintenance information for the brake?

4. Was the manufacturer under a duty to warn the operator of the Unimac of the hazard involved in reaching into the spinning extractor cylinder?

Viewing the evidence in a light most favorable to the party opposing the motion and admitting the truth of all evidence introduced by that party, *Adroit Supply Co. v. Electric Mutual Liability Ins. Co.,* 112 Ariz. 385, 542 P.2d 810 (1975); *Byrns v. Riddell, Inc.,* 113 Ariz. 264, 550 P.2d 1065 (1976), we note the following facts necessary for a determination of this matter. The Unimac Company shipped its Unimac Model 202 washer-extractor to the Country Club Car Wash in June of 1967. The Unimac 202 is basically a three compartment toploading unit consisting of two washing machines separated by a centrifugal rinse-extractor. The rinse-extractor is a cylindrical stainless steel basket driven by an electric motor. The basket spins at 1725 r.p.m.s while in operation. When the lid covering the extractor compartment is raised, a micro switch disconnects the electric current to the motor and a mechanical brake is applied. The brake works as follows. As the lid is raised, a vertical brake rod attached to the rear of the lid is pulled up which in turn raises a rear cam arm. Two parallel cams, which are set into grooves cut into the top of the motor housing, then roll into a vertical position and force two brake shoes up against the revolving disc fixed to the bottom of the extractor basket. At the time the Unimac 202 was manufactured and shipped, this brake was capable of stopping the spinning extractor cylinder in less than ten seconds after the lid was raised.

The extractor was also equipped with a timer which automatically turned the extractor motor off after a pre-set time. The basket would then coast to a stop in approximately five minutes without aid of the brake. At peak hours during the operation of the car wash, the employees, who needed a continuous supply of clean towels to dry off cars, bypassed the timer and put the lid-activated brake to constant use.

The manager of the car wash, John Feagan, was responsible for the maintenance and repair of the Unimac. He testified that when he arrived at the car wash in October 1969 he could adjust the brake according to the instruction manual supplied by Unimac Company so that the cylinder stopped within ten seconds after the lid was raised. By November 1972, five and one-half years after delivery of the Unimac to the car wash, the brake mechanism of the appliance was in a state of great disrepair, and the brake itself was frequently inoperative. Feagan testified that in his opinion the main reason for the excessive wear on the brake was its constant use, combined with the fact that the employees loaded the extractor basket unevenly, causing the unit to wobble and vibrate. According to Feagan, he was not authorized to order replacement parts from the Unimac Company because he was kept on a "tight budget." Those parts which he had replaced prior to Roger's injury, the cams, the cam arm, and the brake linings, were fabricated by a local welder and installed by Feagan himself.

When the brakes were not working, the car wash employees stopped the spinning extractor after raising the lid by taking a towel and pressing down on the rim or the hub of the basket with the towel. The assistant manager of the car wash, Noel Dusek, testified that he instructed Barrett Rogers to stop the unit in this manner.

The morning of the day Rogers was injured the brake shoes of the Unimac fell off repeatedly, and were replaced by the manager. Rogers was pressing down on the hub of the spinning basket when a loose towel caught his arm and wrenched it into the mechanism.

An examination of the brake unit the next day revealed worn cams and a broken cam arm, a cracked brake shoe, and worn shock absorbers. The grooves on top of the motor housing were worn so that the cams dropped through.

Plaintiff contended at trial that the accident would not have happened had the Unimac been equipped with a lid lock. The plaintiff introduced into evidence the American National Standards Institute guidelines for laundry machinery. The Institute recommended safety interlocks on centrifugal extractors, i. e. a lid lock which holds the cover closed and locked while the basket is spinning.

Vaughn Adams, an assistant professor of industrial design at Arizona State University, testified as plaintiff's expert witness. He stated that a hazard existed in the Unimac 202 as designed in that the operator is exposed to the centrifugal rotation of the basket for up to ten seconds after the extractor lid is raised. In his opinion, the Unimac should have been designed with a lid lock in conformance with the ANSI recommendations. He also testified that in addition to a lid lock, the machine should have had a warning affixed to it to alert the operator to the extreme hazard involved in reaching into the spinning basket should either the electric brake or the lid lock fail. On cross-examination, Adams admitted that he had not made any field comparisons of various braking systems of other commercial washer-extractors, nor had he investigated the impact of the ANSI recommendations on the design of washer-extractors since publication of the recommendations in 1961.

The assistant vice-president and chief engineer for Unimac Company, Charles Wyckoff, testified that the company had been incorporating the mechanical brake at issue into their extractors since 1952. He stated that the company was aware of the ANSI recommendations but declined to adopt the lid lock-electrical brake for its top loaders because the company's experience was that the mechanical brake was "superior to anything we could find" in terms of braking capacity, safety and reliability. Both he and the president of Unimac Company, Robert Cowen, testified that early in 1968 Unimac Company was forced to switch to the lid lock-electrical brake mechanism for some of their washer-extractors because the company could no longer purchase the single-phase motor required for the mechanical brake. On those units with the electrical brake, Unimac Company affixed a decal which cautioned against opening the lid until the basket stopped. The company felt this warning was necessary because the potential for brake failure was higher with an electric brake, and that if the lid lock became defective or was disconnected a potential hazard existed.

At the trial, the court denied the defendant manufacturer's motions for a directed verdict and submitted the case to the jury which was unable to reach a verdict. The trial court then declared a mistrial and granted defendant's motion for directed verdict.

## MUST THE PLAINTIFF SHOW THAT THE WASHER–EXTRACTOR WAS "UNREASONABLY DANGEROUS"?

█ The brief of the plaintiff and the brief of the amicus curiae urge this court to hold that in a strict products liability action an injured plaintiff should not be required to show that the defect in the product which caused the injury also made the product unreasonably dangerous to users or consumers. *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963) is cited in support of that position. In that case the California Supreme Court stated:

"A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a

defect that causes injury to a human being * * * [T]he liability is not one governed by the law of contract warranties but by the law of strict liability in tort." 59 Cal.2d at 62–63, 27 Cal.Rptr. at 700–01, 377 P.2d at 900–01.

Shortly after *Greenman,* supra, the Restatement (Second) of Torts, § 402A (1965) was adopted which required proof of a "defective condition unreasonably dangerous to the user or consumer."

The Arizona courts, as did others, apparently assumed that the standards in *Greenman* and § 402A of the Restatement of Torts (Second) were the same. See *Baily v. Montgomery Ward and Co.,* 6 Ariz.App. 213, 431 P.2d 108 (1967); *Eck v. Helene Curtis Industries, Inc.,* 9 Ariz.App. 426, 453 P.2d 366 (1969). When this court adopted the theory of strict liability set forth in the Restatement (Second) of Torts, § 402A (1965) in *O. S. Stapley Co. v. Miller,* 103 Ariz. 556, 447 P.2d 248 (1968), there was no apparent need to distinguish the rule in *Greenman,* supra, and the Restatement. The California Supreme Court, however, has stated:

"to require an injured plaintiff to prove not only that the product contained a defect but also that such defect made the product unreasonably dangerous to the user or consumer would place a considerably greater burden upon him than that articulated in *Greenman.* We believe the *Greenman* formulation is consonant with the rationale and development of products liability law in California because it provides a clear and simple test for determining whether the injured plaintiff is entitled to recovery." *Cronin v. J. B. E. Olson Corp.,* 8 Cal.3d 121, 134–35, 104 Cal.Rptr. 433, 443, 501 P.2d 1153, 1163 (1972). See also *Glass v. Ford Motor Co.,* 123 N.J.Super. 599, 304 A.2d 562 (1973); *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975).

It was not until 1976 that this court addressed itself to the problem of the difference between the California rule as set forth in *Greenman,* supra, and the Restatement rule. In *Byrns v. Riddell,* supra, we rejected the California rule and adopted the Restatement rule of an "unreasonably dangerous" defect.

In the instant case, the plaintiff, to withstand a motion for directed verdict, had the obligation of showing not only that the Unimac Model 202 washer-extractor was defective when it left the factory, but also that such defect made the product unreasonably dangerous and was also the proximate cause of the plaintiff's injury. *Byrns v. Riddell,* supra.

## LACK OF A LID LOCK

█ The Unimac 202, when shipped to the Country Club Car Wash in 1967, was equipped with two safety features. First, a micro switch cut off the electrical current to the motor when the lid was raised. This prevented the motor from running while the lid was open. Second, raising the lid applied a mechanical brake which stopped the cylinder within ten seconds. That the Unimac Company could have adopted a different type of safety device, i. e. a lid lock, is not in itself sufficient evidence to establish defective design. Under strict liability principles, a manufacturer is required to adopt those safety devices which would prevent the product from becoming unreasonably dangerous.

█ We do not believe the evidence showed a defect in design which made the Unimac 202 unreasonably dangerous. The most the evidence presented by the plaintiff showed was improper maintenance and repair of the machine and not defective design. The safety features of the Unimac 202 were a reasonable preventative of injury so long as the machine was properly maintained. The manufacturer is not liable for lack of normal maintenance.

Plaintiff cites several cases in support of his position. *Rivera v. Rockford Machine & Tool Co.,* 1 Ill.App.3d 641, 274 N.E.2d 828 (1971); *Garcia v. Halsett,* 3 Cal.App.3d 319, 82 Cal.Rptr. 420 (1970); and *Davis v. Fox River Tractor Co.,* 518 F.2d 481 (10th Cir. 1975). These are distinguishable in that there was a clear showing of design defect.

**308**

*Thomas v. General Motors Corp.*, 13 Cal. App.2d 81, 91 Cal.Rptr. 301 (1970) was a case of design defect because of the use of inferior material.

In the instant case, plaintiff's evidence at trial was not sufficient to raise an inference that there was a defect in the design or manufacture of the Unimac brake assembly.

## FAILURE TO PROVIDE ADEQUATE MAINTENANCE INFORMATION

■ The plaintiff's alternative theory of liability at trial was that the Unimac was defective because it was sold to the car wash without adequate instructions for maintenance of the unit.

Plaintiff points to Comment (j) Restatement (Second) of Torts § 402A which states that a seller of a product may be required to give directions or warnings to the user or consumer in order to prevent the product from being unreasonably dangerous. See *Tucson Industries, Inc. v. Schwartz*, 108 Ariz. 464, 501 P.2d 936 (1972).

There was an instruction manual and a parts list supplied with the Unimac 202 which contained instructions for brake adjustment and maintenance. We need not consider the sufficiency of these instructions, however, as there is no evidence that the failure to warn was a proximate cause of the injury.

Although the manager of the car wash was held responsible for all maintenance and repair of the Unimac, he was not authorized to order replacements parts from the Unimac Company. On cross-examination he stated:

"Q You had observed considerable wear in the unit prior to the injury, hadn't you?

"A Yes, sir.

"Q And with the wear that you had experienced in that aluminum bell [the motor housing], wasn't it pretty obvious to you that you weren't going to get this unit to operate properly until you were permitted to get a replacement of some of the parts that had been badly worn?

"A I would have to say that is correct, sir.

"Q So that your repairs that you were making, say, at the time of the accident, just before the accident, you recognized were simply temporary, and since the wearing had occurred, you would not ever be able to get the unit to stay in adjustment or properly operating until you were able to get the repair parts?

"A I would have to say that is correct also."

The manager was aware that the Unimac brake assembly needed major repairs without resort to any maintenance manual. Regardless of the manual, the manager was not in a position to make the needed repairs. This failure was not the result of any lack of care on the part of the defendant-manufacturer. As the 5th Circuit Court of Appeals stated:

"The uncontradicted evidence clearly reflects that the maintenance requirements for the assembly were obvious from inspection and that both Boyd and Mayes knew without reference to the manual that maintenance was required and needed and that a tight fit had to be maintained at the joint, as called for by the manual. The tendency of the evidence was that the manual would not have been followed in any event * * *.

"It is regrettable that the lack of maintenance of the assembly resulted in the serious injuries to appellee, but liability cannot be visited upon those who were not charged with the maintenance of the assembly nor contributed to the lack of it." *Bond v. Transairco Co.*, 514 F.2d 642, 645 (5th Cir. 1975).

We believe that even if the Unimac maintenance manual were characterized as somewhat lacking, the plaintiff failed to show that the manager's failure to repair the Unimac was the result of the alleged inadequate information.

## FAILURE TO WARN

The plaintiff finally contends that the Unimac Company should have placed a warning on the extractor of the hazard involved in reaching into the spinning cylinder. He argues that a warning was necessary because the machine was so designed that the operator had to lift the lid to apply the brake, and was thus exposed to the spinning cylinder for at least ten seconds or longer, depending upon the condition of the brake.

The brake design of the Unimac 202 was, at the time of manufacture and is today, a common and accepted safety design. But we need not decide whether this ten-second interval was an unreasonably dangerous defect because the lack of a warning was not the proximate cause of the injury. While Barrett Rogers did testify on direct examination

"Q  If there had been such warnings on the unit itself, Barrett, warning that it was dangerous to do that, or containing information concerning the amount of forces generated by the spinning basket and the possibility of getting entangled in towels and injured, would you have put your hand inside the spinning basket in order to stop the unit?

"A  No, sir."

he also stated on cross-examination:

"Q  Mr. Haralson asked you if there had been a warning, whether you would have observed it. Let me ask you this: Suppose there had been a brake on the device, on the extractor, which would have stopped the basket or the cylinder from turning, say, within five to ten seconds after you opened the lid, under those circumstances can I assume you would not have attempted to stop the cylinder by placing your hand on this knob?

"A  Yes, sir.

"Q  Yes, you would not have?

"A  I would not have.

"Q  If it would have stopped on its own within ten seconds, you would have let it stop rather than put your hand on the cylinder; correct?

"A  Yes, sir."

Furthermore, we are unwilling to impose liability upon the manufacturer of an appliance for failure to warn of those dangers which may arise because of lack of normal repair. We agree with the reasoning of the Minnesota Supreme Court in a case which involved a high school freshman whose arm was amputated when he reached into a commercial extractor while it was still spinning. The extractor was sold and delivered to the high school six years prior to the accident and was equipped with a safety lid lock which prevented the operator from opening the lid until the basket stopped spinning. After the accident, it was discovered that the ball joint connecting the safety lever cable to the cover was broken, permitting the lid to be opened while the machine was running. The jury found the manufacturer was not negligent in the design of the safety mechanism but was negligent in its instructions as to maintenance and in failing to have a warning on the extractor. The defendant manufacturer appealed, and the Supreme Court of Minnesota reversed the verdict for the plaintiff and ordered the trial court to grant the manufacturer's motion for judgment n. o. v. Although the case was tried on a negligence theory, the court's reasoning is particularly applicable to the facts of the instant case:

"So we start with the premise that the machine as designed, constructed, and delivered was not a dangerous instrumentality and that the safety apparatus would eliminate any danger in use of the machine so long as the safety devices were functioning properly and maintained as they were designed. The question then becomes whether the manufacturer of a chattel free from danger if maintained in the condition in which it is sold must warn against a danger that may exist if the safety features provided are broken or not maintained by the user.
* * *

"There is a distinction between operational instructions and a warning of inherent danger in the use of a chattel. The manufacturer of a chattel can hardly be ex-

pected to warn of every conceivable danger that might arise from misuse of the chattel or failure to maintain it after it breaks down. Here the machine as delivered was safe if used properly. It was used without mishap for a period of 6 years. * * *

"It would be carrying the duty of a manufacturer too far to require it to anticipate every injury that may occur when the machine is improperly used. * * *

"If the chattel is safe when sold, a manufacturer is not required to anticipate or foresee that a user will alter its condition so as to make it dangerous, or that he will continue to use it after it becomes dangerous due to alteration in safety devices intended to protect the user from harm. * * *

"It is difficult to know where to draw the line on a manufacturer's liability in the sale of products. There must be a limit to such liability somewhere. We think this case lies outside the area where liability exists. The manufacturer here has done all anyone could reasonably expect it to do in making the chattel safe for the use for which it was intended. The responsibility for maintaining it in the safe condition in which it was sold rested with the user. It was the failure of the school district to discharge that duty that made the injury possible." *Westerberg v. School Dist. No. 792,* 276 Minn. 1 at 6, 7, 10, 11, 148 N.W.2d 312 at 315, 316, 317, 318 (1967).

A warning on the Unimac 202 extractor would not have prevented this injury. The owners and managers of the Country Club Car Wash required their young employees to work with an extractor made hazardous because of lack of repair. The Unimac 202 presented no unreasonable danger of injury so long as it was properly maintained. The defendant Unimac Company was entitled to a directed verdict.

Judgment affirmed.

STRUCKMEYER, V. C. J., and HAYS and HOLOHAN, JJ., concur.

GORDON, Justice (dissenting):

I do not agree with that portion of the opinion of this Court which holds that whether the design of a product is unreasonably dangerous or not is a matter to be decided by the Court as a matter of law on a Motion for Directed Verdict when there is conflicting evidence on that issue. I would leave that question to be decided by the jury under proper instruction. I concur, however, with the remainder of the opinion in all other respects.