674 P.2d 883

Glen Barton TURNER, Plaintiff-Appellant,

v.

MACHINE ICE COMPANY, a Texas corporation; Leer Manufacturing Company, Inc., a Wisconsin corporation, Defendants-Appellees.

No. 1 CA–CIV 5445.

Court of Appeals of Arizona, Division 1, Department B.

Sept. 29, 1983.

Review Denied Dec. 20, 1983.

While Magma chooses to explain the differential in price between continuous cast rod and cathode copper as a manufacturing charge, A.R.S. § 42–1311 is directed at an entity which charges for service, but does not actually sell the product serviced. A.R.S. § 42–1311(B), provided, during the period in question, that: "In the case of persons engaged in the businesses classified in subdivision (a) of paragraph 2 of § 42–1310, whose incomes, wholly or in part, are derived from service or manufacturing charges instead of from sales of the product manufactured or handled, the rate shall be applied to the gross income of such persons derived from such service or manufacturing charge."

13. The Department admitted in its Reply to Counterclaim, that if the assessment attributable to the income from converting refined cathode copper into rod and bars was held to be void, that Magma would be entitled to a refund in the amount of $654.25.

Langerman, Begam, Lewis & Marks by Noel A. Fidel and Stanley J. Marks, Phoenix, for plaintiff-appellant.

Jones, Skelton & Hochuli by William R. Jones, Jr., Phoenix, for defendant-appellee Machine Ice Co.

Jennings, Strouss & Salmon by Michael A. Beale and John A. Micheaels, Phoenix, for defendant-appellee Leer Mfg. Co., Inc.

## OPINION

CORCORAN, Judge.

This is a products liability case. The sole issue on appeal is whether the trial court erred when it ruled as a matter of law in granting a directed verdict at the end of the plaintiff's case that a product is not unreasonably dangerous when the design defect alleged is open and obvious. The pertinent facts follow:

On May 26, 1976, appellant Glen Turner injured his hand while operating an ice machine at the Circle K ice plant. The ice machine was manufactured by appellee Leer Manufacturing Company, Inc. and was sold to appellee Machine Ice Company, which, in turn, installed the ice machine at the Circle K ice plant. Circle K has not been a party to this proceeding.

Turner had been working for Circle K at the ice plant for approximately two weeks. His duties were those of a general laborer, including loading ice into trucks, cleaning up, and assisting in the operation of the ice machine involved in his injury. He had just completed his freshman year at college and was working for the summer.

The function of the ice machine was to produce ice cubes into blocks of ice, each approximately 6″ × 6″ × 12″ in size. Ice cubes were dropped into the ice machine's compression chamber and were then compressed by a hydraulic ram into a block of ice. After compression, a solid 1½″ guillotine-like metal gate located at the front of the compression cylinder would slide down and the ram would then push the newly made block of ice out of the compression chamber through a 6″ × 6″ opening in the front of the machine. When the ice block had been ejected from the compression chamber, the metal gate would snap up, closing the chamber so that the compression process could be repeated. It took a split second for the metal gate to move from the down position to the up position. After the ice block was ejected from the chamber, it traveled down an exit ramp to a bagging machine, located approximately four feet in front of the ice machine itself.

Turner was assisting in the operation of the ice machine for the second day. The accident occurred at about 10 p.m. in the swing shift. The temperature in the room was between 40° to 45°. Turner wore gloves and an insulated jump suit. As ice blocks were produced by the machine it was his responsibility to remove unmarketable ice blocks and crushed ice from the exit ramp and to remove the remaining marketable ice blocks to be stacked after they had been bagged and tied by the bagging machine located at the end of the exit ramp in front of the ice machine. To accomplish this task, Turner needed to position himself alongside the exit ramp which ran from the ice machine to the bagging machine. In the course of the operation of the ice machine, a quantity of crushed ice was also ejected, and Turner, in attempting to wipe the crushed ice off the ramp, accidentally stuck his left hand into the metal gate and failed to remove his hand before the gate moved up. As a result, his hand was smashed by the closing gate, amputating three fingers.

The gate was a piece of steel 1½″ thick. It raised to a closed position in a fraction of a second. It did not open and close at fixed intervals and a worker would not know when it was about to close. There was no guard to prevent access of a worker's hand to the vicinity of the gate.

Turner's sole theory of recovery at trial was that the ice machine was defective and that Leer and Machine Ice were strictly liable in tort. The only defect in the machine claimed by Turner was that it did not have a safety device, specifically some sort of a guard, in front of the metal gate and

opening to the compression chamber, making it difficult or impossible for anyone using the machine to place his hand inside the gate.

At the close of Turner's case, Leer and Machine Ice made motions for directed verdicts on the issue of liability. These motions were based on the uncontested fact that the danger presented by the unguarded compression chamber gate was open and obvious and, thus, not unreasonably dangerous. In response, Turner argued that the obviousness of the defect in the ice machine was only one factor to be considered in determining whether the defect was unreasonably dangerous. The trial court granted appellees' motion and this appeal ensued. We reverse.

The main thrust of Turner's argument on appeal is based on this reasoning: That the Supreme Court's decision in *Byrns v. Riddell, Inc.,* 113 Ariz. 264, 550 P.2d 1065 (1976), rejects, as the only factor to be considered, the distinction between latent and patent defects for the purpose of imposing strict tort liability; that since the trial court allegedly relied upon this distinction as the sole basis for granting the directed verdict, its decision must be reversed. We agree.

■ Arizona has continued to adhere to the standards imposed by 2 *Restatement (Second) of Torts* § 402(A) (1965). Under the *Restatement* a plaintiff must prove that the product which caused him injury was defective, that the defect was unreasonably dangerous, and that his injuries were proximately caused by the defect. *Rogers v. Unimac Co.,* 115 Ariz. 304, 565 P.2d 181 (1977); *Vineyard v. Empire Machinery Co.,* 119 Ariz. 502, 581 P.2d 1152 (App.1978).

■ The parties to this appeal have not briefed the question of whether the failure to place a safety guard around the compression chamber gate constitutes a *defect* in the ice machine's design; therefore, we find that the parties tacitly recognize that the lack of a sheer-point safety guard is a defect and pass to the determination of whether that defect is "unreasonably dan-

gerous." *See Vineyard,* 119 Ariz. at 505, 581 P.2d at 1155.

■ The dangerousness of a product cannot be measured in absolute terms. A determination that a product is *unreasonably* dangerous necessarily involves a balancing of considerations; a weighing of the likelihood and gravity of the harm against the utility of the product and the burden of taking precautions which would be effective to eliminate the danger. Our Supreme Court acknowledged this balancing approach in *Byrns v. Riddell, supra.*

Citing *Dorsey v. Yoder Co.,* 331 F.Supp. 753 (E.D.Pa.1971), *aff'd,* 474 F.2d 1339 (3rd Cir.1973), the court in *Byrns* set forth the following risk/benefit factor analysis to determine if a defect is unreasonably dangerous:

(1) The usefulness and desirability of the product;

(2) the availability of other and safer products to meet the same need;

(3) the likelihood of injury and its probable seriousness;

(4) the obviousness of the danger;

(5) common knowledge and normal public expectation of the danger (particularly for established products);

(6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings); and

(7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive.

113 Ariz. at 267, 550 P.2d at 1068.

■ The *Byrns* risk/benefit analysis has been criticized because it places emphasis on the reasonableness of the risk associated with a product rather than on some property of the product itself. *See e.g. Brady v. Melody Homes Mfr.,* 121 Ariz. 253, 589 P.2d 896 (App.1978). In design defect cases, however, the use of negligence terminology is seemingly unavoidable because the adequacy of a product's design necessarily depends upon its reasonableness. *See Restatement* § 402A. Were the negligence-like concept of unreasonable danger to be

purged from the strict liability equation, sellers of products would incur absolute liability for any injury proximately caused by an intended use of a product, regardless of the insignificance of the risk posed by the defect or the fortuity of the resulting harm. *See Cronin v. J.B.E. Olson Corp.,* 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972), wherein the California Supreme Court apparently eliminated the requirement that a plaintiff show that the defect in a product was unreasonably dangerous.

■ We follow the lead of our Supreme Court in *Byrns* and adopt its risk/benefit factor analysis in determining whether the ice machine's design in this case was unreasonably dangerous. Although the *Byrns* analysis employs negligence terminology, the risk/benefit approach to determining whether a product is unreasonably dangerous can more accurately be seen as a limitation on liability, otherwise any defect in a product, without any consideration of risk, would render a *defendant* absolutely liable.

Leer and Machine Ice urge this court to find that the ice machine was not unreasonably dangerous because the danger created by the unguarded compression chamber door was patently obvious. In essence, the appellees advocate a reinvigoration of the so-called "latent-defect" rule established by this court in *Maas v. Dreher,* 10 Ariz.App. 520, 460 P.2d 191 (1969). Under this rule an injured party is precluded from recovery where the danger encountered is not hidden, and thus is to some degree reasonably contemplated by the average user. The "latent-defect" rule, however, was specifically rejected by our Supreme Court in *Byrns* as *encouraging* patent design defects. 113 Ariz. at 267, 550 P.2d at 1068. For a similar reason in *Palmer v. Massey-Ferguson, Inc.,* 3 Wash.App. 508, 476 P.2d 713 (1970), a Washington appellate court held that it was proper for a trial court to refuse to give a requested instruction that a manufacturer has no duty to provide guards to prevent injury from a patent peril or source manifestly dangerous:

The rule excusing the duty of safe design because of a patent peril has come under criticism in treatises. See 1 Frumer & Friedman, Products Liability § 7.02 (1968). It seems to us that a rule which excludes the manufacturer from liability if the defect in the design of his product is patent but applies the duty if such a defect is latent is somewhat anomalous. *The manufacturer of the obviously defective product ought not to escape because the product was obviously a bad one. The law, we think, ought to discourage misdesign rather than encouraging it in its obvious form.*

3 Wash.App. at 517, 476 P.2d at 718–719 (emphasis added).

■ Clearly, in measuring the likelihood of harm, one may consider the obviousness of the defect since it is reasonable to assume that the user of an obviously defective product will exercise special care in its operation and consequently the likelihood of harm diminishes. The obviousness of a defect is, however, only one factor to be considered in the determination of whether the defect is unreasonably dangerous. *Byrns,* 113 Ariz. at 267, 550 P.2d at 1068; *Moorer v. Clayton Mfg. Corp.,* 128 Ariz. 565, 568, 627 P.2d 716, 719 (App.1981), *cert. denied,* 454 U.S. 866, 102 S.Ct. 328, 70 L.Ed.2d 167 (1981); *see Vineyard v. Empire Machinery Co.,* 119 Ariz. 502, 505, 581 P.2d 1152, 1155 (App.1978); *see* W. Kimble & R. Lesher, *Products Liability* § 135 (1979). Therefore, we hold that even though the danger associated with the unguarded compression chamber gate was obvious to Turner, this fact does not *ipso facto* preclude recovery. Other factors must be considered in determining the likelihood of injury associated with the ice machine's operation.

At trial, Turner's expert witness, David V. MacCollum, a safety engineer, testified as follows:

Q [Direct examination by Mr. Marks, Turner's counsel]: Do you have an opinion, based upon reasonable scientific probability—certainty, that this machine that is indicated in the photograph and discussed in the depositions was unreasonably dangerous for its intended and foreseeable use?

A  Yes.

Q  What is your opinion?

A  Well, I feel that it is unreasonably dangerous *because the hazard is severe and its likelihood of causing injury is well-defined in standards background, as to the requirement for easily and reasonably guarded guards for such devices that minimize this danger with nominal cost and are effective and they do not interrupt the production.*

Q  What type of guarding are you talking about, sir?

A  Oh, primarily two types. One is a shield guard, which one of the photos [in evidence] has on it. By its nature, it makes it difficult to reach into the danger zone. The other is a flap, which would serve to cover the guillotine or shear area, and either or both, working in tandem, would provide an effective guard by all acceptable standards known for a number of years.

(Emphasis added.)

On cross-examination, Mr. MacCollum testified as follows:

Q  [By Mr. Beale, counsel for Leer]: No one needed to tell you, even though you never saw this machine in operation, that if you put your hand in there where that gate operates, you would be injured?

A  Well, to me, as a safety engineer, *I know that that type of arrangement results in only a matter of time until someone, for some reason, somehow gets their hands into it and then an injury results.* So, my life has been geared to the prevention and it's very basic to me that the way you prevent these types of injuries is not to base it upon hopefully hoping that all human performance is going to be 100 percent perfect 100 percent of the time. *The easiest, the cheapest and the most expedient method is to put a guard on it.*

(Emphasis added.)

Furthermore, Mr. MacCollum testified that because the ice making process required the stationing of an employee near the compression chamber gate the level of risk associated with the unguarded compression chamber gate was increased:

Q  [By Mr. Marks]: There's been testimony here that Mr. Turner—or the positioning of ... Mr. Turner was where this X is on the diagram [between the bagging machine and the ice machine along side the exit ramp] .... I believe the testimony was that [he] had to take a small step to the left to brush away ice that would be coming out of the machine that was not made as it should be in the 6 by 6 by 12 length ....

....

Is the proximity to this shearer or gate an important factor to you in making your analysis?

A  It's a very critical matter, because it's acceptable on work surface or floor space that you work in and, also, because of the necessity to often sort defective product as it comes out, that is, the ice cubes that are unsatisfactory for bagging, and, also, if there is some debris of snowball or chips or chunks of ice, the next perfect or the next usable block of ice will come out, go down the ramp and it will precede it and slide it into the bag in front of it and, hence, make it difficult to package it into the sack.

So, because of this, there are many production and pure incentives to see that that trash or hunks of spare ice are not going to contaminate your useful product and, because of this, *the risk is increased, because the people are going to be frequenting that area with their hands and they're going to be doing it out of the side of their eye, where they don't always have direct vision.*

(Emphasis added.)

■■■  Even when a danger is appreciated, circumstances may cause it to be momentarily forgotten. When a person must work in a place of possible danger, the care which he is bound to exercise for his own safety may well be less, due to the necessity of giving attention to his work, than is normally the situation. In this case, in order to operate the ice machine in an efficient and economical manner, Turner had to stand in the vicinity of a closing gate capable of amputating human limbs and, on

occasion, he had to reach within a few inches of the compression chamber gate to remove from the machine's exit ramp any ice residue or small unsalable ice blocks which did not have enough weight to travel down the ramp. Considering the nature of human inattentiveness and momentary forgetfulness, the risk associated with the unguarded gate was great despite the fact that the danger was obvious.

The deposition of Douglas M. Connor, a Vice President of and engineer for Machine Ice, was read at trial. Although Mr. O'Connor stated that he was not qualified to testify whether the ice machine without a guard was *defective,* he did testify that it would have been *"absolutely"* obvious to anyone looking at the gate that it would have been dangerous to put his hands in the path of the gate. He also stated that the placing of a safety guard at the chamber opening was feasible and practicable and that such a guard would not interfere with the functional operation of the ice machine. Indeed, a guard was placed on the machine within a day or two after the Turner accident.

Q [By Mr. Marks]: Did the guard being placed on the machine affect the operation of the machine at all or the securing of the product from the machine?

A No.

Q In other words, if the guard had been on before Bart Turner had been injured, that would not have interfered with his job at all, is that correct?

. . . .

A Yes.

On a motion for directed verdict at the end of plaintiff's case, the trial judge must view the evidence in a light most favorable to plaintiff, accepting the truth of whatever evidence he has introduced. *Byrns, supra.* The evidence clearly shows that Turner knew of the danger presented by the unguarded compression chamber gate. On the other hand, a guard would not have eliminated the machine's usefulness nor would it in any way interfere with the functional operation of the machine. Moreover, the likelihood of injury was "only

a matter of time" and its probable seriousness was great. Although no evidence was presented as to the cost of placing a guard on the machine, it is apparent from the exhibits introduced at trial, showing the cage-like guard which was installed on the ice machine following Turner's accident, that the cost of the guard was small by any standard. Ultimately, all of these factors were to be weighed by the jury in making their determination as to whether the ice machine was unreasonably dangerous as designed. *See Byrns, supra.* Balancing the likelihood of harm and the gravity of harm if and when it happens against the burden of the precaution which would be effective to avoid the harm, we find that reasonable minds could differ in whether the balance tipped in favor of appellees Machine Ice and Leer.

During the argument on appellees' motion for a directed verdict, appellees took the position that the *Byrns* decision had lost vitality in light of this court's holding in *Vineyard v. Empire Machinery Co., supra,* which they believed had resurrected the patent-latent defect rule. The appellees mistook the import of *Vineyard,* which involved an earth moving machine allegedly defective for lack of rollover bars. In *Vineyard* this court acknowledged the holding of *Byrns v. Riddell* that obviousness of danger is a relevant consideration but not controlling in determining the issue of unreasonable danger. This court then turned to the more significant consideration, likelihood of danger, and found that plaintiff's case was completely lacking in evidence on that point. Absent evidence that the 20-ton earth mover had the propensity to roll over, the court characterized the likelihood of danger as "slight." Thus, *Vineyard* stands for the proposition that an open and obvious defect does not render a product unreasonably dangerous *absent evidence* that significant risk of serious harm remains despite the obvious nature of the defect. It does not alter the rule in *Byrns v. Riddell* that where, as here, a plaintiff demonstrates that a defect presents a serious risk of harm whether latent or patent, he is

entitled to a jury determination on the question of unreasonable danger.

The judgment of the trial court is reversed.

RICHARD M. DAVIS, Judge Pro Tem., concurring:

I concur in the opinion by Judge Corcoran. I write to address one aspect of appellees' argument which I deem salient.

Appellees' argument is grounded upon comment (i) under § 402A. One portion of this comment states:

The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases [uses] it, with the ordinary knowledge common to the community as to its characteristics.

This sentence was quoted by the court in *Byrns v. Riddell, Inc.,* 113 Ariz. 264, 550 P.2d 1065 (1976). In holding that an issue of fact was presented as to whether there was an unreasonably dangerous design defect, the court in *Byrns* stated that "[t]he 'bottoming out' defect might be of a type that a *reasonable consumer would not contemplate."* 113 Ariz. at 268, 550 P.2d at 1069.

The appellees here argue, in substance, that the passage quoted from comment (i) states a requirement which exists independent of the balancing process set forth in *Byrns* and which survives that decision's disapproval of the use of the patent-latent distinction in products liability cases. They further argue on the basis of the evidence adduced here that the critical movement of the machine was exactly as contemplated by its purchasers and users, including the plaintiff. They assert in essence that based upon the qualification quoted above from comment (i) the machine was as a matter of law not *unreasonably* dangerous.

It is not clear to me just how wide a swath the "dangerous beyond contemplation" language of comment (i) was intended to cut. The examples which appear in comment (i) seem to suggest a narrower application than would be pertinent here. We are told, for example, that even "castor oil found use under Mussolini as an instrument of torture."

Given *Byrns'* careful rejection of the rule excluding liability for patent defects and its inclusion of obviousness as a factor to be considered in the balancing process, as well as the reasons given by our Supreme Court for adopting § 402A as set forth in authorities such as *Tucson Indus., Inc. v. Schwartz,* 108 Ariz. 464, 501 P.2d 936 (1972), I cannot see how the passage quoted from comment (i) can be applied to foreclose a cause of action for lack of a guard installable at "nominal" cost to cover a shear point this close to a necessary human activity. *Cf. Moorer v. Clayton Mfg. Corp.,* 128 Ariz. 565, 627 P.2d 716, *cert. denied,* 454 U.S. 866, 102 S.Ct. 328, 70 L.Ed.2d 167 (App.1981). As Judge Corcoran's opinion notes, appellees' argument here to the contrary boils down in the final analysis to an argument for non-liability for obvious defects.[1] This *Byrns* clearly rejects.

Since liability for obvious defects has obviously won the day across the land and since "contemplation" may arguably at least be viewed as poaching semantically in this domain, it would seem that the American Law Institute might profitably attempt further articulation of what the concept of "contemplation" means as it is used in comments (g) and (i) under § 402A.

JACOBSON, C.J., concurs in the result.
NOTE: The Honorable RICHARD M. DAVIS was authorized to participate in this case by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. VI, § 20.

---

1. It must be borne in mind that only an assumption of known risks, as opposed to conventional contributory negligence, is a defense to § 402A claims. *See Mather v. Caterpillar Tractor Corp.,* 23 Ariz.App. 409, 533 P.2d 717 (1975).