Katherine GOMEZ, Appellant,

v.

CLARK EQUIPMENT COMPANY, Respondent.

No. WD 39110.

Missouri Court of Appeals, Western District.

Nov. 3, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 29, 1987.

Application to Transfer Denied Feb. 17, 1988.

Michael W. Manners and C. Robert Buckley of Paden, Welch, Martin & Albano, Independence, for appellant.

E. Wayne Taff of Sherman, Wickens, Lysaught & Speck, P.C., Kansas City, for respondent.

Before CLARK, P.J., and TURNAGE and MANFORD, JJ.

MANFORD, Judge.

Appellant (plaintiff) appeals from a jury verdict in favor of respondent (defendant) on appellant's claim for damages under a theory of product liability. The judgment is affirmed.

Appellant raises four points on appeal and charges that the trial court erred (1) in excluding certain opinion testimony; (2) in overruling appellant's objection to the interjection, by respondent, of the issue of appellant's Workers' Compensation claim; (3) in barring appellant's expert witness from testifying as to the issue of foreseeability; and (4) in instructing the jury on contributory negligence.

In its brief, respondent addresses these points but further responds that any error, if committed, is harmless because appellant failed to make a submissible case. This court agrees with respondent, finding that appellant has failed to make a submissible case, and therefore affirms the judgment without addressing appellant's points of error.

The pertinent facts are as follows:

Appellant was employed as a stockman at the Owens–Illinois plant in North Kansas City. In her capacity as stockman, appellant's duties included the operation of two different kinds of lift trucks: fork lifts and clamp trucks.[1] Because both types of trucks carry their loads in front, the cargo often prevents the operator from being able to see ahead of the truck. Therefore, the truck is often operated in reverse while transporting a load.

Some of the lift trucks operated by appellant were Model C20Bs, clamp trucks manufactured by respondent. These trucks were powered by liquefied petroleum gas ("LPG") fuel contained in a vertical fuel tank located directly behind the operator's seat. The tank was protected from puncture or rupture by a steel guard which wrapped around the tank. The guard was welded or bolted onto the truck and LPG tanks were changed or replaced by removing the tank from the guard and inserting a new tank.

There were two C20B trucks at the Owens–Illinois plant, trucks numbers 7 and 8. These trucks were identical and appellant had operated both trucks. These trucks were obtained by Owens–Illinois through a dealer for respondent. When the trucks were shipped from respondent's factory, they were equipped with a 19-inch vertical tank guard for a 20-pound LPG fuel tank, and a connecting hose attached to the truck. The trucks were not shipped with fuel tanks. The dealer delivered the trucks to Owens–Illinois in the condition described above, but with the addition of a 20-pound LPG fuel tank on each truck.

Sometime after the trucks were delivered, Owens–Illinois removed the 20-pound tanks and inserted 33½-pound tanks. Because these tanks were several inches taller, the conversion required the removal of the connecting hose and the replacement of a longer connecting hose. The diameter of the 20-pound tank is identical to that of the 33½-pound tank, therefore no modification to the tank guard was necessary. However, a 33½-pound tank would be left exposed at its top portion when such a tank is used with a 20-pound guard. Furthermore, with the combination of a 33½-pound tank and a 20-pound guard, the guard would vibrate and break, requiring reweld-

---

**1.** A fork lift truck has forks in front that go under skids on which materials are positioned. A clamp truck has a clamp in front which compresses materials on two sides and lifts the materials off the floor.

ing. Therefore, at least on truck number 8, Owens–Illinois replaced the 20–pound tank guard with a taller guard which could be used with a 33½–pound tank. There was no evidence on when the guard was replaced, how such a modification was effected, or how the taller guard was obtained. Both truck numbers 7 and 8 carried the 33½ tanks and longer hoses, however only truck number 8 was modified with the taller guard.[2] There was also some evidence that the counter-balancing mechanism on truck number 8 had been altered.

On the morning of May 18, 1981, appellant was operating truck number 8, making trips between the factory and the warehouse to move materials. The materials were to be transported from the factory to the warehouse and stacked in rows adjacent to an aisle. The boxes were to be stacked inside yellow lines on the warehouse floor to keep the aisle clear, but on this day some of the boxes were stacked outside the yellow lines, creating some congestion in the aisle. There were also support posts along the yellow lines, extending from the warehouse floor to the ceiling. These posts had a concrete base about four feet high with a steel pole extending beyond that point. One of the support posts, near row 39, held a fire extinguisher on its aisle side. This fire extinguisher was contained inside a metal "box" frame which extended beyond the diameter of the concrete base. The post and the frame were painted yellow.

Appellant testified that she had operated truck number 8 on previous occasions. Each time she would carry a load, she would be driving in reverse because of the load on the front of the truck. Appellant testified that as she proceeded in reverse, it was necessary to keep a lookout to the rear to avoid collision with any objects. Appellant stated, however, that the 33½–pound tank and taller guard, located directly behind her seat, was of such a height that it completely obscured her vision of objects directly behind her. For this reason, it was

necessary for appellant to turn her head and twist her body in such a manner so she could see around the tank and guard. Because of the twisting and turning of her head and body, appellant testified that she would place her right hand on the guard post, which encircles and protects the operator of the truck, to keep her balance as she would twist and turn her body to look to the right rear and left rear. Appellant concedes that there would be no such rear visibility problems in operating C20B's equipped with a 20–pound tank and shorter guard.

On the morning of May 18, 1981, appellant had made two trips to the warehouse in the vicinity of row 39. On both occasions, she would back down the aisle past the support post with the fire extinguisher, then turn to her left and unload the cargo into rows across the aisle from row 39. Since the area was congested, appellant had to follow the routine of twisting and turning to look around the tank and guard to see behind her. When she would back up and look over her right shoulder, she could and did see the post with the fire extinguisher near row 39.

On appellant's third trip to this area of the warehouse, she followed the same routine. As she was backing out, she looked to her right rear, placing her right hand on the guard post, and saw the support post and fire extinguisher, then turned her head and body to the left to look to the left front (to make sure her load would clear as she turned), and as she began to turn her head back to the right, she struck the support post, crushing her fingers on her right hand between the guard post and the metal frame of the fire extinguisher.

Appellant freed herself and was taken to the hospital where, after 12 hours of surgery, the four fingers on her right hand were amputated.

As stated *supra*, appellant concedes that there were no rear visibility problems when operating a C20B with a 20–pound LPG

---

**2.** It should be noted that the addition of the taller guard on truck number 8 did not create any greater obstruction to rear visibility than a

truck with a 33½ pound tank and a 20–pound guard because the height of the tank is the same in either instance.

fuel tank and the shorter guard. Appellant also concedes that the truck in question was modified after if left the manufacturer.

The defectiveness of a product is measured as of the time the product enters the stream of commerce. Generally, the subsequent alteration of the product is a defense to strict liability. American Law of Products Liability 3d, § 16:48 at 62 (1987). Appellant argues, however, that the rule is not absolute.

Appellant relies heavily on *Vanskike v. ACF Industries, Inc.*, 665 F.2d 188, 195 (8th Cir.1981), cert. denied, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982), which, applying Missouri law, stated the exception as follows:

> [S]ubsequent changes or alterations in the product do not relieve the manufacturer of strict liability if the changes were foreseeable and the changes did not unforeseeably render the product unsafe.

*Id.* at 195, citing *Hales v. Green Colonial, Inc.*, 490 F.2d 1015, 1020 (8th Cir.1974).

Appellant urges this court to adopt her interpretation of the above-quoted language which she states as follows:

> [A] modification *will* relieve a manufacturer of liability if; (1) The modification is not foreseeable; or (2) The hazard created by the modification is unforeseeable. Conversely, if the hazard created by the modification *is* foreseeable, then the manufacturer is liable.

This court recognizes that appellant arrives at this interpretation by employing the grammatical rule of "cancelling out" a double negative so that two negatives equal a positive. Granted, if something is "not unforeseeable", then logically it is "foreseeable". However, this court is not convinced that the federal courts in *Hales* and *Vanskikes* intended such a meaning.

■ To thoroughly confuse the matter further, both this court and our sister court in the Eastern District have interpreted the language in *Hales* and *Vanskikes* to mean: a manufacturer is not relieved of liability if "the changes were foreseeable and did not make the product unsafe." *Duke v. Gulf & Western Manufacturing, Co.*, 660 S.W.

2d 404, 414 (Mo.App.1983), and *see Jarrell v. Fort Worth Steel & Manufacturing Co.*, 666 S.W.2d 828, 835 (Mo.App.1984). In other words, if a modification is foreseeable, but the modification makes a safe product unsafe, the manufacturer is not liable.

■ Under the present set of facts we assume, for the sake of argument, that it was foreseeable that Owens–Illinois would install the 33½–pound LPG fuel tank and taller guard. However, this court finds that the alteration of the tank system made the lift truck unsafe, therefore the cause of the injury was the modification and not the original condition of the truck. Had not the taller tank been installed, appellant would not have had an obstruction to rear visibility and therefore, assuming the visibility problem was the cause of the accident, appellant would not have been injured.

Applying the rule as clarified by this court, the outcome of *Hales* and *Vanskike* remains the same.

In *Hales,* the plaintiffs were owners of a retail store for which they purchased from defendant a heater. The heater was designed for use with natural gas and was presumably properly designed for such use. However, plaintiffs ordered the heater to be used with LPG fuel, and defendant supplied to plaintiffs the conversion kit to convert the heater to LPG fuel. The plaintiffs installed the heater with the converter and the heater exploded, causing a fire that destroyed the building.

The court held that defendant was liable despite the modifications because it was foreseeable that the purchaser would modify the heater as was done, and that there was evidence, sufficient to make a submissible case, that the modification was not the superseding cause of the injuries. Defendant, in that case, had manufactured the heater so that it could be used with LPG fuel *and* defendant supplied the necessary parts for the conversion. There was no evidence that the conversion was done improperly. It cannot be said that modification was the superseding cause, rather the defective design of the heater

when used with LPG fuel, as it was intended, was the *cause* of the injuries.

In examining *Vanskike*, we find that applying the rule as stated by this court results in the same disposition. In *Vanskike*, plaintiff worked on railroad cars. The product in question was a hitch used to secure semi-trailers onto railroad cars. Apparently, some retaining rings on the hitch had been removed by some third person, not the manufacturer, allowing the roller pins to fall out, causing the hitch to collapse. The plaintiff was injured when the above-described events occurred. The court held that there was evidence that it was foreseeable that purchasers or users of the hitch would remove the retaining rings. However, the removal of the retaining rings was not the superseding cause of the injuries because there was expert testimony that the hitch was defectively designed so that it would not hold the retaining rings at all.

Unlike the case of *Vanskike, supra*, in the present case there was no evidence of any defect in the truck as provided by the respondent. In addition, as noted, the evidence revealed that the change or modification was by Owens–Illinois and was the sole cause of appellant's injuries as those injuries allegedly were related to the manufacture of the truck. Where the change or alteration is the sole cause of the damage, the question is one of law. *See Hales, supra*, at 1021, citing *Swindler v. Butler Manufacturing Co.*, 426 S.W.2d 78 (Mo. 1968).

The trial court should have sustained respondent's motion for directed verdict.

The judgment is affirmed.

All concur.