Jennifer JONES, Appellant,

v.

RYOBI, LTD; A.B. Dick Corporation, Appellees.

No. 93–2719.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1994.

Decided Oct. 12, 1994.

Rehearing Denied Nov. 21, 1994.

424

Fritz Faerber, Belleville, IL, argued (Fritz G. Faerber and Charles R. Scanlon, on the brief), for appellant.

James W. Reeves, St. Louis, MO, argued, for appellee A.B. Dick.

John Galvin III, St. Louis, MO, argued (G. Keith Phoenix, John E. Galvin and Mark A. Smith, on the brief), for appellee Ryobi, Ltd.

Before FAGG, Circuit Judge, HEANEY, Senior Circuit Judge, and LOKEN, Circuit Judge.

FAGG, Circuit Judge.

Jennifer Jones was employed at Business Cards Tomorrow (BCT) as the operator of a small printing press known as an offset duplicator. Jones seriously injured her left hand when she caught it in the moving parts of the press. Alleging negligence and strict product liability for defective design, Jones brought this diversity lawsuit against Ryobi, Ltd. (the manufacturer) and A.B. Dick Corporation (the distributor). At trial, Jones dropped her negligence claims but she later moved to amend her complaint to reassert her negligence claim against the distributor. The district court denied Jones's motion to amend. At the close of Jones's case, the manufacturer and the distributor moved for judgment as a matter of law (JAML). The district court granted the manufacturer's and the distributor's motions for JAML. Jones appeals and we affirm.

The press involved in Jones's injury operates by passing blank paper through several moving parts, imprinting an image on the paper, and dispensing the printed paper through upper and lower "eject wheels." To avoid streaking the freshly printed image, on each job the operator must adjust the eject wheels to ensure the wheels do not touch the freshly printed area. The press was manufactured and sold to BCT equipped with both a plastic guard that prevented the operator from reaching into the moving parts to ad-

just the eject wheels, and an electric interlock switch that automatically shut off the press if the guard was opened. Sometime after the press was manufactured and delivered to BCT, the guard was removed and the interlock switch was disabled to allow the press to run without the guard. Because this modification increased production by saving the few seconds required to stop and to restart the press when the operator adjusted the eject wheels, the modification was a common practice in the printing industry.

Jones learned to operate the press by watching other BCT employees. Jones testified she knew the guard was missing and knew it was dangerous to have her hands near the unguarded moving parts, but her supervisor pressured her to save time by adjusting the eject wheels while the press was running. Jones feared she would be fired if she took the time to stop the press. While Jones was adjusting the eject wheels on the running press, a noise startled her. Jones jumped and her left hand was caught in the press's moving parts and crushed.

■ In granting the manufacturer's and the distributor's motions for JAML, the district court relied on the open and obvious nature of the asserted danger. *See* Restatement (Second) of Torts § 402A cmt. i (1965) (consumer expectation test). The district court did not reach the manufacturer's and the distributor's other grounds for JAML. We review the district court's grant of JAML de novo; thus, we may affirm on another ground. *See McAnally v. Gildersleeve*, 16 F.3d 1493, 1496 (8th Cir.1994); *B.B. v. Continental Ins. Co.*, 8 F.3d 1288, 1291 (8th Cir. 1993). Because we conclude the district court's grant of JAML was proper on an alternate ground, we need not consider the ground relied on by the district court.

■ To recover on a theory of strict liability for defective design under Missouri law, Jones must prove she was injured as a direct result of a defect that existed when the press was sold. *Jasinski v. Ford Motor Co.*, 824 S.W.2d 454, 455 (Mo.Ct.App.1992) (explaining elements of defective design claim). Jones had the burden to show the press had not been modified to create a defect that could have proximately caused her injury.

*Id.* Jones failed to meet this burden because her evidence showed the press had been substantially modified by removing the safety guard and disabling the interlock switch, and showed the modification caused her injury. When a third party's modification makes a safe product unsafe, the seller is relieved of liability even if the modification is foreseeable. *Gomez v. Clark Equip. Co.*, 743 S.W.2d 429, 432 (Mo.Ct.App.1987). Jones did not show who modified the press, but her evidence clearly showed that a third party, not the manufacturer or the distributor, was responsible for the modification.

■ Although the manufacturer provided tools for general maintenance of the press that could also be used to remove the guard, we do not believe this made the manufacturer responsible for the guard's removal. Jones produced no evidence that any representative of the manufacturer or the distributor removed the guard or instructed BCT to remove the guard from the press involved in Jones's injury. Indeed, the distributor's service representative testified he told BCT's owner several times the guard should be replaced, but BCT's owner shrugged off the suggestion. Because BCT knew the guard was missing and the interlock switch was disabled, but did not follow the distributor's advice to repair the disabled safety features, the distributor's service work on the press did not extend the distributor's liability to defects that were not present when the press was sold. *See Winters v. Sears, Roebuck & Co.*, 554 S.W.2d 565, 572–73 (Mo.Ct.App. 1977) (seller's servicing of product has effect of redelivery only if plaintiff produces evidence no third party altered product to create defect causing injury).

■ Jones argues the modification rule does not apply because the press was not safe even before the modification. We disagree. The press was safe before the modification because the press would not run without the safety guard covering the moving parts. The fact BCT encouraged Jones to operate the press without the safety features to increase production does not show the press was sold "in a defective condition [and thus] was unreasonably dangerous when put

to a reasonably anticipated use." *Jasinski,* 824 S.W.2d at 455. Although several witnesses testified the press operated more efficiently without the safety guard and interlock switch, other witnesses testified similar presses operated satisfactorily with the designed safety features intact. The press could be operated safely without removing the guard because the eject wheels did not have to be adjusted while the press was running. Jones's expert witness opined the press was unsafe as designed, but the expert based his view on the printing industry's tendency to disable the press's safety features to achieve greater production. Thus, the expert's testimony does not show the press was unreasonably dangerous when used in the same condition as when it was sold. *See id.*

■ Because Jones's evidence showed a third party's modification, not a defect existing when the press was sold, was the sole cause of her injury, her strict product liability claim for defective design fails as a matter of law. *See Gomez,* 743 S.W.2d at 433. The district court thus properly granted the manufacturer's and the distributor's JAML motions.

■ Finally, Jones contends the district court committed error in refusing to allow her to amend her complaint to reassert her negligence claim against the distributor. We disagree. The district court did not abuse its discretion to deny the amendment because the evidence presented did not show colorable grounds for Jones's negligence theory. *See Williams v. Little Rock Mun. Water Works,* 21 F.3d 218, 224 (8th Cir.1994).

Accordingly, we affirm.

HEANEY, Senior Circuit Judge, dissenting.

Viewing the evidence in the light most favorable to Jones, as we must, I cannot subscribe to the majority's opinion that the offset duplicator was safe as originally manufactured.

The rule to which Missouri adheres, as correctly stated by the majority, is that a manufacturer is not liable where a modification is foreseeable, but the modification renders a safe product unsafe. *Gomez v. Clark Equip. Co.,* 743 S.W.2d 429, 432 (Mo.Ct.App. 1987). Representatives of ITEK Corp., the former distributor of the duplicator, testified that the guard was removed by customers or others a "vast majority" of the time, trial tr. at 57, 138, and that ITEK knew that the guard was "routinely removed." *Id.* at 82. Thus, the modification of the duplicator was entirely foreseeable.

The question that arises is whether the modification rendered an otherwise safe product unsafe. There is no dispute that the duplicator, as modified, was unsafe. The critical question, thus, is whether the duplicator as manufactured was unreasonably dangerous.

The testimony of Dr. Creighton, Jones's expert witness, is alone sufficient to support the inference that the offset duplicator was not safe as originally designed. Dr. Creighton testified that the electric interlock device was wired backwards and was not "fail-safe." *Id.* at 249–50, 52. He testified that the duplicator's guard, in addition to not being fail-safe, *id.* at 250, was made of material "that will break ... readily," *id.,* did not allow for proper ventilation of the internal components of the machine, *id.,* and invited removal. *Id.* at 253. He further testified that the design of the eject wheels, which essentially requires operators to make manual adjustments while the offset duplicator is running, was "absolutely not safe," *id.* at 242, indeed "the worst of situations from a human factors standpoint." *Id.* at 256. The duplicator could have been equipped, he noted, with external adjustment handles to enable operators to make adjustments to the eject wheels without placing their hands in close proximity to the moving parts of the machine. *Id.* at 251.

Further, although not direct proof that the duplicator was defectively designed, the fact that an overwhelming majority of machines had their guards removed after their delivery is evidence that the duplicator was incapable of operating efficiently according to industry standards. According to ITEK representative Brad Gruenewald, nearly ninety-eight percent of all machines he came into contact with had their safety covers removed. *Id.* at

138. Indeed, Gruenewald testified that he told duplicator operators in effect to remove the guard in order to alleviate problems with ink emulsification that occurred as a result of humidity which frequently became trapped inside the plastic shield. *Id.* at 62.

The majority does not address (nor need it, given the focus of its opinion) the open-and-obvious defense on which the district court relied in granting the defendants' motion for judgment as a matter of law. I touch on it briefly because, even assuming Ryobi is not relieved of liability under the substantial modification theory, the question still remains whether it can prevail based on the alleged open and obvious danger of the unguarded duplicator.

We have held that the obviousness of a defect or danger is material to the issue of whether a product is unreasonably dangerous. *Linegar v. Armour of Am., Inc.*, 909 F.2d 1150, 1154 (8th Cir.1990). It does not, however, alone constitute a defense to a submissible case of strict liability under section 402A of the Restatement (Second) of Torts. *McGowne v. Challenge–Cook Bros., Inc.*, 672 F.2d 652, 663 (8th Cir.1982). The issue under Missouri law, as we have construed it, "is not whether a jury can conclude that [the] danger is obvious or apparent, but ... whether the jury can conclude that the danger is obvious and apparent to the extent that the product was not 'unreasonably dangerous.'" *Id.* Stated otherwise, the question is not simply whether the danger was open and obvious, but whether the product was unreasonably dangerous taking into account the obviousness of the danger.

There is no question in my mind that there was sufficient evidence from which a jury, taking into account the obviousness of the conceded danger, could conclude that the offset duplicator was unreasonably dangerous. The district court relied on our holdings in *Pree v. Brunswick Corp.*, 983 F.2d 863, 867 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 65, 126 L.Ed.2d 35 (1993), and *Linegar,* 909 F.2d at 1154—cases which are analogous in precious few ways to the instant case—in holding that the open-and-obvious nature of the unguarded duplicator "was readily observable by everyone," trial

tr. at 440, and therefore barred recovery by Jones. In *Pree* we held that an unguarded outboard motor on a boat was not unreasonably dangerous because no device existed that would provide protection from a propeller without rendering the motor more dangerous. 983 F.2d at 866. In *Linegar* we held that a bullet-proof vest that did not cover all parts of the body was not inherently dangerous because "[a]n otherwise completely effective protective vest cannot be regarded as dangerous, much less unreasonably so, simply because it leaves some parts of the body obviously exposed." 909 F.2d at 1154. In both cases we relied on the open-and-obvious nature of the alleged danger in holding that the products were not unreasonably dangerous and thus were not defectively designed.

In my judgment there *was* sufficient evidence to support the inference that the offset duplicator was unreasonably dangerous and thus was defectively designed. This case should have met its fate in the hands of the jury members, not the district court's and not now ours.