3 P.3d 1088

Patrick ANDERSON, Plaintiff–Appellant, Cross–Appellee,

v.

NISSEI ASB MACHINE CO., LTD.; Nissei ASB Company, Defendants–Appellees, Cross–Appellants.

Nos. 1 CA–CV 98–0304, 1 CA–CV 98–0339.

Court of Appeals of Arizona, Division 1, Department B.

Dec. 23, 1999.

Review Denied April 18, 2000.*

---

* Vice Chief Justice Jones recused himself and did not participate in the determination of this matter.

John H. Anderson, San Clemente, CA, and Jennings Strouss & Salmon, P.L.C. by James M. Ackerman, Phoenix, for Plaintiff–Appellant, Cross–Appellee.

Renaud, Cook & Drury, P.A. by Charles S. Hover, III and William W. Drury, Jr., Phoenix, for Defendants–Appellees, Cross–Appellants.

## OPINION

BERCH, Judge.

¶ 1 In this products liability case, the jury found Nissei ASB Machine Company and Nissei ASB Company ("Nissei") liable for manufacturing a defective machine that caused Patrick Anderson to lose his right arm, and awarded $3,250,000 in damages. Following trial, however, the trial court granted Nissei's motion for judgment as a matter of law ("jmol").[1] On appeal, Anderson seeks to have the trial court's grant of the jmol reversed and the jury's verdict reinstated. Nissei has cross-appealed, seeking a new trial if the jmol is set aside. For the reasons that follow, we re-

---

**1.** *See* Ariz. R. Civ. P. 50 (1996). The parties refer to the motion as one for a judgment notwithstanding the verdict ("jnov"); we refer to the motion by its current label, a motion for judgment as a matter of law ("jmol"). In either incarnation, the standards remain the same.

verse the jmol, reinstate the jury's verdict, and deny Nissei's request for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶ 2 In May of 1993, Patrick Anderson was working at Star Container Company when his right arm was caught in, crushed, and amputated by a vertical injection, stretch-blow molding bottle-making machine manufactured and distributed by Defendants Nissei. The bottle-making machine is designed to produce plastic bottles by rotating plastic resin through a multi-step operation conducted from four operating stations. First, plastic resin is fed into injectors, where it is heated and compressed. The melted plastic is injected into molds to produce "pre-forms," which then rotate to the stretch-blow molding station where they are stretched into bottles. Finally, the plastic bottles are rotated to an ejection station where they are discharged from the machine.

¶ 3 Each station is enclosed by a safety cage, the entry to which is guarded by "safety doors." At the injection station, yellow "purge guards" are attached by three screws to the safety doors. Opening or jarring the safety doors or purge guards automatically shuts off the entire machine.

¶ 4 From time to time, bottles become stuck in the ejection station and must be manually removed so that they do not jam the machine. Anderson testified that bottles regularly became stuck and that, on the average, he removed at least five stuck bottles a night. It was in removing a bottle that Anderson's arm became caught.

¶ 5 The machine also emits a molten waste material at the injection station, which is referred to as "drool." Drool drips onto machine parts and wires and, despite the connotations of the term, quickly hardens into rock-like lumps, which, if not promptly removed, will damage the machine and render it inoperable. The buildup of drool must be checked and removed at least every fifteen minutes.

¶ 6 Although Nissei distributed a detailed manual explaining the operation and safety features of the bottle-making machine, the manual contains no instructions on how to remove drool. Thus Star employees devised a method for removing it: They would insert a long stick with a hook on the end into the three-inch gap between the purge guards on the safety doors at the injection station and drag it out. Anderson testified that the drool was difficult to remove with the purge guards on because the opening was so small that it was easy for the stick or the drool to hit and jar the safety doors, which would shut the machine down. Once the machine shut down, it could remain down for as much as two hours because every time the machine stopped, the operator had to manually remove jammed bottles, restart the machine, and allow time for the resin to reheat. If the machine were shut down every fifteen minutes to remove drool, significant production delays would occur.

¶ 7 To facilitate the drool removal, prevent the lost production time, and make the machine work as it was intended to work, someone removed the purge guards. Doing so was easy because the guards were attached to the machine only by three small screws, not by rivets or welds. Nor was removing the purge guards uncommon; both Anderson and Tom Kerin, an engineer for Star Container, testified that they had observed purge guards missing from other machines. No one disputed that the machine lacked purge guards at the time of the accident. Anderson testified that scooping drool was much easier once the purge guards were removed because the absence of the guards widened the opening from three to six inches. Thus the operator had more room to insert the long drool-removal stick and drag out drool without accidentally jarring the safety doors and shutting down the machine.

¶ 8 On the day of the accident, Anderson was working his usual shift when he was called by another Star employee to remove a bottle that had become stuck. He went to the injection station and, without opening the safety doors, reached inside the machine to pull the stuck bottle out of the mold. He had previously reached into all six of Star Container's bottle-making machines without opening the safety doors. This time, however, as he reached into the machine, it closed,

crushing then amputating his hand and forearm.

¶ 9 After hearing and weighing the evidence, the jury returned a verdict for Anderson in the amount of $3,250,000, for which Nissei was found to be 21% liable. The jury found Anderson to be partly responsible for his own injuries and assigned 25% of the fault to him. The remaining fault was attributed to Anderson's employer, Star Container Company. Nissei moved for a jmol or, in the alternative, a new trial. The court granted the jmol and denied Nissei's motion for a new trial. Anderson appeals the trial court's grant of a jmol and Nissei has cross-appealed. We have jurisdiction of this appeal pursuant to Arizona Revised Statutes Annotated ("A.R.S.") section 12–2101(F)(1) (1994).

## DISCUSSION

¶ 10 Anderson asserts that because substantial evidence supported the jury's verdict, the trial court erred in granting Nissei's motion for judgment as a matter of law. A trial court should grant a jmol "only if the facts presented in support of a claim have so little probative value that reasonable people could not find for the claimant." *Shoen v. Shoen*, 191 Ariz. 64, 65, 952 P.2d 302, 303 (App.1997), *review denied* (Mar. 17, 1998), *cert. denied*, 525 U.S. 923, 119 S.Ct. 278, 142 L.Ed.2d 230 (1998) (citing *Piper v. Bear Med. Sys.*, 180 Ariz. 170, 173, 883 P.2d 407, 410 (App.1993)). While a grant of a new trial is reviewed deferentially, a grant of a jmol, in which the trial court substitutes its decision for that of the jury, is reviewed *de novo. See id.*, (reviewing jnov); *Koepnick v. Sears Roebuck & Co.*, 158 Ariz. 322, 329, 762 P.2d 609, 616 (App.1988) (same). In reviewing a jmol, we must view the evidence most favorably to sustaining the jury's verdict, and must not disturb that verdict "if reasonable minds could differ as to the inferences to be drawn from the facts." *Adroit Supply Co. v. Electric Mut. Liab. Inc. Co.*, 112 Ariz. 385, 390, 542 P.2d 810, 815 (1975) (jnov); *Huggins v. Deinhard*, 127 Ariz. 358, 361, 621 P.2d 45, 48 (App.1980) (same). We must therefore determine whether sufficient evidence supports the jury's verdict. *See Lerner v. Brettsch-*

*neider*, 123 Ariz. 152, 153, 598 P.2d 515, 516 (App.1979).

## I. Products Liability

¶ 11 To succeed in a products liability lawsuit based upon a design defect claim, a plaintiff must establish that (1) the defendant manufactured or sold a product, (2) the product was defective in its design and unreasonably dangerous, (3) the defect existed at the time the product left the defendant's control, (4) the defective condition proximately caused the plaintiff's injury, and (5) the plaintiff suffered damages as a result. *See Jimenez v. Sears, Roebuck and Co.*, 183 Ariz. 399, 402, 904 P.2d 861, 864 (1995) (citations omitted). The jury determines whether the product is defective and whether the plaintiff suffered damages. *See Dietz v. Waller*, 141 Ariz. 107, 111, 685 P.2d 744, 748 (1984); *Meyer v. Ricklick*, 99 Ariz. 355, 357, 409 P.2d 280, 282 (1965). The jury also decides whether the product proximately caused the plaintiff's injuries, unless the facts are undisputed and reasonable jurors could not differ in the judgment. *See Kavanaugh v. Kavanaugh*, 131 Ariz. 344, 352, 641 P.2d 258, 266 (App. 1981).

### A. Defective Product

¶ 12 Nissei maintains that the grant of the jmol was appropriate because no evidence was presented on which a jury could base a finding that the machine was defectively designed and unreasonably dangerous when it was sold to Star Container Company. We disagree. At trial, Anderson presented evidence, with which Nissei's witness agreed, that drool had to be removed every fifteen minutes or it would damage the machine. But Nissei provided no instructions in the product manual for removing drool and failed to inform users of a safer alternative method for removing drool than that devised by the Star employees. Shutting off the machine every fifteen minutes was not a viable alternative method for removing drool.

¶ 13 Moreover, Anderson presented Robert Johnson, a plastics expert, who testified that the machine violated several of the product safety standards set by the American National Standards Institute ("ANSI"). For

example, Johnson stated that the machine violated ANSI standard 4.1, which requires that a builder furnish instructions on how to operate and care for its machines. Johnson testified that "there was nothing . . . in the manual that admitted [that the machine produced a by-product called] drool nor gave any indication how it was to be removed from the machine. . . ." Additionally, an engineer for Star testified that this by-product was a constant problem that had to be checked or removed every fifteen minutes. Thus Star Container's employees were left to devise their own method for removing the drool.

¶ 14 From this testimony, the jury could reasonably have inferred that Nissei failed to provide either adequate instructions on how to safely remove the drool, or a safe, obvious method for removing it, and thus the product was defective and unreasonably dangerous. We will not, nor may a trial judge, "reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because [the judge felt] that other results [were] more reasonable." *See Hutcherson v. City of Phoenix*, 192 Ariz. 51, 56, 961 P.2d 449, 454 (1998) (citing *Tennant v. Peoria & Pekin Union Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944)).

¶ 15 Anderson's witnesses also presented sufficient evidence from which the jury could have found that Nissei failed to comply with other ANSI standards and failed to take other simple, inexpensive precautions. For example, ANSI standard 3.4 requires a fixed guard that is "not readily removable" to protect "areas of the machine where hazards exist." Anderson presented evidence that the purge guards were affixed only by three small screws, not by rivets or welds, and thus were easily removed. ANSI standard 3.5 defined moveable guards as being "so interlocked as to prevent operation of the machine when the guard is moved" and standard 5.3.4 required purge guards to be interlocked. Thus, if Nissei intended the guards to be moveable rather than permanent, they should have been interlocked. Had the guards been interlocked as required by the ANSI standard, the machine would not have been operable once the guards were removed

and Anderson would not have been injured. In determining whether a design defect exists, juries may weigh the burden or cost of taking a precaution against the likelihood of harm. *See Dart v. Wiebe Mfg.*, 147 Ariz. 242, 245–46, 709 P.2d 876, 879–80 (1985) (risk benefit test); *Boy v. I.T.T. Grinnell Corp.*, 150 Ariz. 526, 533–34, 724 P.2d 612, 619–20 (App.1986) (consumer expectation test). They may reasonably have determined in this case that the guards should have been either permanently affixed or sufficiently interlocked that the machine would not operate if moveable guards were removed. These guards were neither.

¶ 16 Robert Johnson, Anderson's plastics expert, also testified that the machine failed to meet ANSI standards 5.2.4 (safety gate lacked interlock); 5.2.5 (no safety device to prevent mold from closing); and 5.3.1 (enclosure between safety gate and injector nozzle not complete). The jurors weighed this and other evidence and determined that Nissei's product was unreasonably dangerous. We will not upset that determination. *See Piper*, 180 Ariz. at 174, 179, 883 P.2d at 411, 416 (jury may find design defect based upon violation of ANSI standards, even though a foreseeable modification has been made).

### B. Unforeseeable Modification Defense

¶ 17 Both parties agreed that the bottle-making machine had been modified from its original condition in that the purge guards had been removed before the accident occurred. Nissei claimed that the modification was unforeseeable and therefore Nissei is not liable for any damage arising from it. Anderson concedes that the machine was modified after it left the manufacturer, but contends that the modification was entirely foreseeable by Nissei. In Arizona, only an unforeseeable modification of a product bars recovery from the manufacturer. *See Piper*, 180 Ariz. at 175–76, 883 P.2d at 412–13.

¶ 18 "Whether a modification or alteration is reasonably foreseeable is . . . for the trier of fact." *Id.* at 176, 883 P.2d at 413. We therefore must determine whether sufficient evidence supports the jury's finding that the removal of the purge guards was

reasonably foreseeable. *See Styles v. Ceranski, M.D., Ltd.*, 185 Ariz. 448, 450, 916 P.2d 1164, 1166 (App.1996). If the decision is supportable, we will not "substitute [our] view of the evidence for that of the jury." *Hutcherson*, 192 Ariz. at 56, 961 P.2d at 454. We conclude that the jury's verdict was well supported.

¶ 19 In *Hutcherson*, the supreme court made clear the deference owed to jury decisions. There, a jury determined that a Phoenix 911 operator did not properly categorize a 911 emergency call. *See id.* at 53, 961 P.2d at 451. The caller and her boyfriend were murdered shortly after the 911 call. *See id.* Surprisingly, the jury found the killer only 25% liable and the City of Phoenix 75% liable. *See id.* at 52, 961 P.2d at 450. Finding that the evidence did not justify a verdict imposing three times more responsibility on the 911 operator than on the murderer, this Court reversed and remanded the matter for a reapportionment of fault. *See id.* at 53, 961 P.2d at 451. The supreme court reversed and reinstated the jury verdict, stating that the appellate court "improperly substituted 'its view of the evidence for that of the jury and of the trial court.'" *Id.* at 56, 961 P.2d at 454 (quoting *Hutcherson v. City of Phoenix*, 188 Ariz. 183, 197, 933 P.2d 1251, 1265 (App.1996) (Grant, J., dissenting)). *Hutcherson* is our beacon.

¶ 20 The record in this case is replete with facts supporting the jury's determination that Nissei should have foreseen the removal of the purge guards: Both Anderson and Tom Kerin, an engineer for Star Container, testified that drool had to be dealt with every five to fifteen minutes or it could cause maintenance problems.[2] Anderson testified that opening the safety doors to safely remove the drool would shut off the machine, halting production and causing significant delays of up to two hours per shut-down. The Nissei manual contained no instructions on how to remove the drool, so Star and its employees devised their own method, which allowed removal of the drool without stopping the machine. Anderson testified that the purge guards made removal of the drool difficult.[3] As a result, someone removed the guards, which had the effect of enlarging the space into which the drool pole was inserted. The guards were easily removed as they were attached to the machine only by three small screws, not by rivets. Indeed, purge guards were frequently missing from the machines, as Star Container's witness, Tom Kerin, admitted. Once these guards were removed, a six-inch gap existed into which one could insert a hand or arm. This was the very gap into which Anderson inserted his arm when he was injured.

¶ 21 Our dissenting colleague quotes *Piper*, 180 Ariz. at 176, 883 P.2d at 413, for the proposition that a "modification can be deemed unforeseeable as a matter of law." *See infra* ¶ 44. While that is true, the beginning of the sentence in which that phrase occurs states that "if reasonable minds could not differ, a misuse or modification can be deemed unreasonable as a matter of law." *Id.* We agree that if reasonable minds could not disagree, the judge should decide the issue as a matter of law. But in this case, we conclude that reasonable minds could differ on the issue. Thus it was appropriate to send the modification issue to the jury.

¶ 22 Nissei claims that the record contains no evidence that Star Container's employees removed the guards in order to ease drool removal; therefore Anderson's theory of foreseeability is speculative. While there may not be direct evidence, abundant circumstantial evidence existed that the purge guards were removed for this purpose. Thus the jury was presented ample evidence from which it could find foreseeable that businesses would remove these guards and that Nissei knew that such removal occurred.

---

**2.** Robert Johnson, Anderson's plastics expert, testified that "it's necessary to remove [drool] on a frequent basis, otherwise it would create huge problems in terms of maintenance." Anderson testified that "if there is a lot of drool, [it] gets on the wires, makes a big problem." Tom Kerin acknowledged that drool had to be checked every fifteen minutes.

**3.** Anderson testified as follows: "[W]hen the guards are on there, you have a hard time trying to get that drool out while you are trying to be careful about the door, not opening it."

The jury's inferences were reasonable, not speculative. *See Dietz*, 141 Ariz. at 111, 685 P.2d at 748 (discussing sufficiency of evidence allowing trier of fact to reasonably infer that it was more probable than not that product was defective).

¶ 23 Nissei also argues that the reason for the modification is speculative and contrary to the testimony of defense witnesses who testified that the machine need not have been modified in order to remove the drool. However, both Anderson and Nissei presented witnesses regarding the need for and the foreseeability of the modification. The jury performed its role in weighing the credibility of these witnesses and may simply have found Anderson's witnesses more credible than those presented by Nissei. Having heard the witnesses and seen the evidence, the jury was in the best position to judge which witnesses to believe in order to determine whether the modification was foreseeable. We defer to the jury's determination. *See Hutcherson*, 192 Ariz. at 56, 961 P.2d at 454.

¶ 24 We also find that the jury could reasonably have concluded that the defect proximately caused Anderson's injury, even though he was not removing drool at the time of the accident. Had there been no need to remove drool, the guards would have been in place and Anderson would not have been able to insert his arm into the operating machine and thus would not have been injured.

¶ 25 In dissent, our colleague takes the position, at paragraph 43, that "[w]ithout the 'drool' evidence, the exclusion of which was within the trial court's discretion regarding evidentiary matters,[4] the trial court's ruling is ... clearly correct." But the trial judge vacillated in his rulings regarding drool, sustaining several defense objections, and cutting short plaintiff's presentation of evidence on this issue, but nonetheless allowing much drool evidence to go to the jury. Indeed

even defense counsel asked questions about drool. From that relevant evidence, the jury reasonably found that, because of the drool problem, the machine did not work properly with the safety guards in place. To the extent that the trial judge cut short the presentation of drool evidence, such rulings inured to Nissei's benefit. They harmed only Anderson, who nonetheless managed to establish his position to the jury's satisfaction and does not now complain of the rulings.

¶ 26 Our dissenting colleague correctly notes that there was no proof as to who removed the guard. We acknowledge as much in ¶ 22. Evidence was presented, however, from which the jury could and did find that Nissei knew that someone would remove the guard to facilitate drool removal, especially since the guard was affixed only by three small screws and was easily removable. The jury's findings are reasonable inferences, not, as the dissent suggests, "speculation."

¶ 27 The dissent relies upon a New York case holding that an employer's modification of the safety devices on a machine in order "to meet its own self-imposed production goals" precludes recovery from the machine's manufacturer, even if the modification is foreseeable. *See Robinson v. Reed–Prentice Div. of Package Mach. Co.*, 49 N.Y.2d 471, 426 N.Y.S.2d 717, 403 N.E.2d 440, 441 (1980). We see two critical differences between *Robinson* and the case before us: (1) In this case, the modification was made not simply to increase the employer's productivity, but to make the machine function adequately for the purpose for which it was sold. (2) In *Robinson*, there was no defect in the design of the safety gate at the time the machine left the manufacturer's control. *Id.* at 443–44, 426 N.Y.S.2d 717. In this case, Anderson demonstrated to the jury's satisfaction that the purge guards violated ANSI standards and that the product was therefore defective when it left the manufacturer's control. Arizona's public policy is clear: reasonable, fore-

---

4. The dissent alludes to the deferential "abuse of discretion" standard for reviewing the admission of evidence at trial. The trial judge allowed much drool evidence to come in at trial, rulings with which we agree and to which we defer. It was only in response to the motion for jmol that the trial judge reversed his earlier ruling and

determined that the drool evidence was "not relevant." That determination we review *de novo*. *See Shoen*, 191 Ariz. at 65, 952 P.2d at 303. Because relevance is a broad standard, see *infra* ¶ 36, and we conclude that the drool evidence was relevant to Anderson's case, we reverse the trial judge's ruling on this issue.

seeable alterations of a product will not bar recovery. *See* A.R.S. §§ 12–683(2) (1992), – 681(6) (Supp.1998–1999) (defining "reasonably foreseeable" alterations); *Piper,* 180 Ariz. at 175–76, 883 P.2d at 412–13 (citing 3 *American Law of Products Liability 3d* § 43:16 n. 80; 1A Louis R. Frumer and Melvin I. Friedman, *Products Liability* § 3.03[4] n. 3 (1993)). For these reasons, we do not find *Robinson* persuasive.

¶ 28 The dissent cites five other cases from other jurisdictions as supporting its position, none of which compels a conclusion different from the one we reach here. First, in *Smith v. Hobart Mfg. Co.,* the court held that, "on the evidence presented in this case, a trial court should not have left [the] question [of foreseeability of the removal of a meat-grinder guard] for the jury to decide," but should have decided the issue as a matter of law. 302 F.2d 570, 574 (3d Cir.1962). In that case, however, the court observed that "there was not enough evidence from which the jury could infer that [the manufacturer] had reason, let alone strong reason, to expect that [the employer] would remove the guard and operate the machine without it." *Id.* Nor did the manufacturer there have "actual or constructive notice of the absence of the guard in question," as did Nissei in the case before us. *Id.* at 575 (citing *Snyder v. Longmead Iron Co.,* 244 Pa. 325, 90 A. 630, 631–32 (1914)). Nor did Smith present evidence showing that such guards were regularly removed, *see id.,* as did Anderson in the case before us. Indeed, the court specifically noted that if the employer had reason to expect that the guard would be removed, "the fact that its removal was 'wilful or wanton' would not have made that act a superseding cause to [the manufacturer's] negligence," and thus the manufacturer would have been liable had it had reason to expect that the guard would be removed. *See id.* (citing *Anderson v. Bushong Pontiac Co., Inc.,* 404 Pa. 382, 171 A.2d 771, 773 (1961)). Such reasoning comports with the Arizona rule that we follow here. Finally, there was no evidence, as there was in this case, that the machine was defective when it left the manufacturer.[5] Thus, we find *Smith* distinguishable, but informative because it appears that had the court been presented facts like those before us, it would have allowed the question to go to the jury.

¶ 29 *Jones v. Ryobi, Ltd.,* 37 F.3d 423, 425 (8th Cir.1994), is distinguishable because it relies upon an underlying rule of law that differs from the rule that Arizona has adopted. In Missouri, "[w]hen a third party's modification makes a safe product unsafe, the seller is relieved of liability even if the modification is foreseeable." *Id.* (citing *Gomez v. Clark Equip. Co.,* 743 S.W.2d 429, 432 (Mo.App.1987)). As stated earlier, in Arizona, only an unforeseeable modification of a product bars recovery from the manufacturer. *See Piper,* 180 Ariz. at 175–76, 883 P.2d at 412–13; A.R.S. § 12–683(2); *see also* discussion *supra* ¶ 17. We, of course, follow Arizona law. Moreover, in that case there was no evidence that the press was defective when it was sold, as there was in the case before us. *See Jones,* 37 F.3d at 426.

¶ 30 *McNeely v. Harrison,* 138 Ga.App. 310, 226 S.E.2d 112, 115 (1976), is distinguishable because the modification to the automobile to make it lurch forward, pinning the plaintiff between the car and a wall, was "an unforeseeable intervening act sufficient to relieve Chrysler [ ] [from] negligence liability" and the defect at issue in the case "did not proximately cause [plaintiff's] injury." Here, evidence was presented that defendants had actual or constructive notice that purge guards were removed, and the jury found it foreseeable that users of the machine would do so.

¶ 31 In the next case cited by the dissent, the plaintiff's brother-in-law hot-wired a tractor to make it start, then neglected to tell the plaintiff that he had done so. *See Ford Motor Co. v. Eads,* 224 Tenn. 473, 457 S.W.2d 28, 32 (1970). Unlike the absence of the purge guards at issue before us, the defect in the tractor was not readily apparent to users. *See id.* Instead, the brother-in-law's act was an unforeseeable intervening, superseding cause that relieved the manufacturer of lia-

5. The case was remanded for a new trial on that issue because the trial judge improperly excluded evidence bearing on the issue. *See Smith,* 302 F.2d at 576.

bility. Such was not the situation in the case before us.

¶ 32 Finally, the dissent cites *Davis v. Berwind Corp.*, 433 Pa.Super. 342, 640 A.2d 1289, 1296 (1994) aff'd, 547 Pa. 260, 690 A.2d 186 (1997). That case, however, was a "failure to warn" products liability case, not a design defect case. As the Pennsylvania court described it, "In failure to warn cases, recovery is sought on the theory that the product is 'unreasonably dangerous' when 'unaccompanied by a warning with respect to nonobvious dangers inherent in the use of the product.'" *Id.* at 1295–96 (quoting *Ellis v. Chicago Bridge & Iron Co.*, 376 Pa.Super. 220, 545 A.2d 906, 908 (1988)). Such was not the case here. Moreover, in *Davis*, the court observed that if there has been a change to the product, "the question then becomes whether the manufacturer could have reasonably expected or foreseen such an alteration of its product." *Id.* at 1297 (citing *Bascelli v. Randy, Inc.*, 339 Pa.Super. 254, 488 A.2d 1110, 1115 (1985)). If the manufacturer could have foreseen the modification, then it "should be held responsible for all dangers which result from foreseeable modifications of that product." *Id.* (quoting *Eck v. Powermatic Houdaille*, 364 Pa.Super. 178, 527 A.2d 1012, 1019 (1987)). We agree. Once the modification here was determined to be foreseeable, liability was imposable. Indeed, Pennsylvania and Arizona seem to be in substantial agreement as to the law in this area, for the court in *Davis* cites with approval an Arizona case, along with cases from several other jurisdictions that have determined that a manufacturer may be liable for foreseeable, but not for unforeseeable, modifications made to manufactured products after those products leave the manufacturer's hands. *See O.S. Stapley Co. v. Miller*, 103 Ariz. 556, 560, 447 P.2d 248, 252 (1968) (cited, along with several other cases, in *Davis*, 640 A.2d at 1297–98).

¶ 33 We do not find that these cases compel us to deviate from established Arizona law in this area.

### C. State of the Art Defense

■ ¶ 34 Nissei also seeks an affirmation of the jmol based on an Arizona statute that provides an affirmative defense for manufacturers whose product "conformed with the state of the art at the time the product was first sold." A.R.S. § 12–683(1) (1992). In this case, however, expert evidence was presented that, when the machine was first sold, (1) the machine did not meet ANSI standards, (2) it was not safe, and (3) alternative designs represented the accepted state of the art. Robert Johnson testified that the bottle-making machine in question combined the functions of two machines. Its unusual design and construction caused it to emit drool. This defect, coupled with the failure to include instructions for removing drool, fell short of several ANSI safety standards. From this evidence, the jury could reasonably have found that the machine did not conform to the state of the art when it was sold. *See Piper*, 180 Ariz. at 179, 883 P.2d at 416 (evidence that product violated "ANSI Standards, was not safe, and alternative designs represented the accepted state of the art" sufficient to establish that product "did not conform to the state of the art when it was manufactured"). We will not upset the jury's determination on this point.

### D. Express Warnings Defense

■ ¶ 35 Nissei asserted at trial that it was not liable to Anderson because Anderson admitted he was aware of warnings not to place his hands into areas of the machine that contained moving parts, yet did so anyway. While Anderson's knowledge of the dangers is significant, it does not bar him from recovering damages. *See Jimenez*, 183 Ariz. at 405, 904 P.2d at 867 (applying comparative fault principles to strict liability defenses). Instead, Anderson's damage recovery is reduced in proportion to the degree of his fault. *See* A.R.S. § 12–2505 (1994 & Supp.1998–1999); *see also Turner v. Machine Ice Co.*, 138 Ariz. 329, 333, 674 P.2d 883, 887 (App.1983) ("The obviousness of a defect is . . . only one factor to be considered in the determination of whether a defect is unreasonably dangerous."). The jury was properly instructed on the law and rendered a verdict holding Anderson 25% liable and Nissei 21% liable. We will not upset the jury's apportionment of fault.

**178**

## II. Cross–Appeal

▮ ¶ 36 Nissei has cross-appealed, requesting that if we set aside the jmol, we also remand for a new trial because, it alleges, the trial court improperly allowed evidence of drool into the trial. Nissei asserts that the drool evidence was irrelevant and confusing, since Anderson was not removing drool when he was injured. We find no abuse of discretion in the trial court's initial admission of this evidence, *see Delbridge v. Salt River Project Agric. Improvement and Power Dist.*, 182 Ariz. 46, 53, 893 P.2d 46, 53 (App. 1994), but review *de novo* the trial judge's reversal of that ruling and grant of the jmol on this issue. *See Shoen*, 191 Ariz. at 65, 952 P.2d at 303 (jnov); *see also supra n. 4*. In Arizona, the relevance standard is very broad; relevant evidence need only tend to make the existence of any material fact more or less probable. *See* Ariz. R. Evid. 401. Relevant evidence should be admitted, unless there is some concrete reason for excluding it. *See id.* Rules 402, 403. The issue of drool, and more particularly its removal, was directly relevant to Anderson's claim. Anderson alleged and proved that the machine was modified to allow removal of drool without having to shut the machine down. Had Nissei provided a safe method for removing drool, Star's modification would not have been necessary, the opening into which Anderson put his arm would not have existed, and Anderson would not have been injured. The trial judge ruled correctly in the first instance in admitting this evidence. The error lay in reversing that ruling.

### A. Irregularities in the Proceedings

¶ 37 Nissei claims that it was deprived of a fair trial because of alleged irregularities in the proceedings. In addition to the evidence regarding drool mentioned above, Nissei asserts as error the trial court's failure to instruct the jury that drool could not be considered. For the reasons set forth above, we disagree that the drool evidence was improperly admitted; Nissei's requested instruction therefore was properly denied.

▮ ¶ 38 Nissei also argues that evidence of site visits by Nissei's representatives was prejudicial. Anderson asked at trial whether Nissei's representative visited Star Container and could have seen the modification of the machine. Nissei objected and the objection was sustained. Thus the discussion was limited, and Nissei has presented no evidence that the issue affected the verdict. *See Southern Arizona Freight Lines v. Jackson*, 48 Ariz. 509, 512, 63 P.2d 193, 195 (1936) (trial court should not grant new trial unless it believes that an error has occurred in the original trial that probably affected the verdict). We therefore decline to order a new trial on this ground.

### B. Jury Instructions

▮ ¶ 39 We next consider the court's refusal to give several of the jury instructions Nissei requested. "In determining whether a jury instruction should be given, this court views the evidence in the light most favorable to the requesting party." *Cotterhill v. Bafile*, 177 Ariz. 76, 79, 865 P.2d 120, 123 (App.1993) (citation omitted). If evidence tends to establish a theory supported by an instruction, the instruction should be given. *See id.*

▮ ¶ 40 Nonetheless, on review we find that the trial court was not required to give Nissei's proposed jury instructions. The court need not instruct on "every refinement of the law suggested by counsel," *id.*, and the decision to further instruct the jury is usually left to the trial court's discretion. *See Ott v. Samaritan Health Serv.*, 127 Ariz. 485, 491–92, 622 P.2d 44, 50–51 (App.1980). We conclude that Nissei's requested instructions, individually and taken as a whole, duplicated the RAJI instructions that the court read to the jury. For example, Nissei requested an instruction that "the fact that an alternate safety feature may be available does not in and of itself render a product, which has adopted a different type of safety device, defective and unreasonably dangerous." Another instructed that "[a] manufacturer is not under a duty to make or design a foolproof product, nor is a manufacturer an insurer of the safety of the user." Nissei maintains that these instructions should have been given to rebut Anderson's theory that the machine did not contain all of the necessary safety devices. These instructions were

unnecessary because Anderson did not allege that Nissei should have used a specific safety device or made a foolproof machine. Instead Anderson presented evidence that the safety devices Nissei used should have complied with ANSI standards. Nissei's interests were also protected by the court's reading of RAJI (Civil) Product Liability 3, which explains that a product is defective only if "the harmful characteristics or consequences of its design outweigh the benefits of the design." This instruction implies that the product need not be foolproof. The trial court did not abuse its discretion in denying Nissei's requested instructions.

## CONCLUSION

¶ 41 For the foregoing reasons, we reverse the trial court's grant of a jmol and reinstate the jury's verdict. We deny Nissei's request that a new trial be ordered.

CONCURRING: JAMES B. SULT, Presiding Judge.

THOMPSON, Judge, Dissenting.

¶ 42 The trial judge repeatedly ruled the evidence about "drool" to be inadmissibly speculative and irrelevant.[6] His evidentiary rulings are entitled to considerable deference. *See Maxwell v. Aetna Life Ins. Co.*, 143 Ariz. 205, 213, 693 P.2d 348, 356 (App. 1984). Having allowed Anderson latitude in his attempt to establish a foundation for his "drool" theory to explain the modification of this equipment, the court said, ". . . I don't think that the fact that there is drool in the machine is relevant." The judge indicated, "[b]ut there is no evidence, that's speculation as to what happened, why the guard was removed. That's a theory . . . that's all it is. It isn't any evidence." The court sustained several objections to the "drool" evidence, and even cut off some efforts by plaintiff's counsel to go into it further without waiting for an objection. I would find no abuse of discretion in the trial court's ultimate exclusion of this evidence, on a matter that is clearly a judgment call. My review of the record reveals that no one knew why the machine had been modified such that Anderson could stick his arm into it.[7] No one knew who did it. But the manufacturer did not make it that way, and without some plausible evidentiary basis for the "drool" theory, plaintiff could not prove his case.

¶ 43 In granting judgment for Nissei, the court stated:

> I wrestled with this, as you both know, at the conclusion of the [p]laintiff's case as well as at the conclusion of all of the evidence. I felt, as I do now, that as a matter of law this matter should not have gone to the [j]ury. I made my decision to let it go to the [j]ury.
>
> . . . I should have granted the motion for directed verdict. . . .

Without the "drool," evidence, the exclusion of which was within the trial court's discretion regarding evidentiary matters, the trial court's ruling is, in my view, clearly correct.

¶ 44 Further, even if one accepted plaintiff's theory that someone at Star Container Star Container's production schedule does not make the machine defective, and Star Container's dislike of down time did not justify disabling its safety features. And if Star Container removed the guards to avoid down time and maintain a robust production schedule, this modification cannot be charged to the manufacturer. Star Container's engineer said that drool required attention, as its own manual stated, but never said this was a "problem."

---

6. The majority asserts that the trial court admitted this evidence and then reversed its evidentiary rulings after trial. The record reveals otherwise. Before trial, Nissei moved to exclude the drool evidence, indicating that plaintiff's experts were prepared to blame the removal of the guards on a drool "problem." When, during trial, plaintiff attempted to present this "expert" testimony, the court disallowed it. The judge recited numerous times, during trial, his determination that the drool evidence as it related to the missing guards was speculative and inadmissible. In fact, he said it was not even "evidence." The jury was told that drool was a byproduct of the manufacturing process, and that Nissei's manual did not explain how to deal with it. Plaintiff said that, if the machine shut down when you tried to remove drool, it caused down time which his employer disfavored. But an inability to meet

7. The majority's assertion that the guards were removed because of a drool removal problem is, as the trial court deemed the same assertion by Anderson's lawyer, mere speculation. No witness could testify to this, and the jury could not guess.

removed the guards because "without the guards then you could get [drool] out much easier," this does not make the manufacturer liable for an injury caused by such a grossly mistaken alteration by plaintiff's employer— *disabling the safety features of the equipment to meet a production schedule imposed by the employer which could not safely be met.* In *Piper,* 180 Ariz. at 176, 883 P.2d at 413, we acknowledged that a "modification can be deemed unforeseeable as a matter of law." (citing *Brown v. Sears, Roebuck & Co.,* 136 Ariz. 556, 562, 667 P.2d 750, 756 (App. 1983)). Cases from around the nation hold that a modification that disables a safety feature on a machine prevents imposition of products liability on the manufacturer.

¶ 45 In *Robinson v. Reed–Prentice Division of Package Machinery Co.,* 49 N.Y.2d 471, 426 N.Y.S.2d 717, 403 N.E.2d 440, 441 (1980), the operator of a plastic molding machine was severely injured when his hand was caught inside the machine while it was running. The machine had come from the manufacturer with a safety gate containing a Plexiglas window that allowed the operator to monitor operations but did not permit operator access until the machine was off. *See id.* The company that employed the operator, and which purchased the machine, cut a hole in the Plexiglas window after it was determined that the machine's design did not comport with the company's production requirements. *See id.* at 442. The modification "destroyed the practical utility of the safety features incorporated into the design of the machine," and the operator was injured when his hand went through the opening cut in the window and was drawn into the molding area. *Id.* There was evidence that the equipment manufacturer knew of the modification. *See id.* The New York Court of Appeals, noting that "if a manufacturer knows or has reason to know that its product would be used in an unreasonably dangerous manner ... it may not evade responsibility by simply maintaining that the product was safe at the time of sale," nonetheless found

the manufacturer not liable. *Id.* at 442–44, 426 N.Y.S.2d 717. The court wrote that "[w]hile it may be foreseeable that an employer will abuse [8] a product to meet its own self-imposed production needs, responsibility for that willful choice may not fall on the manufacturer." *Id.* at 443, 426 N.Y.S.2d 717. This holding squares with generally accepted notions on the subject. *See* 3 American Law of Products Liability 3d, § 43.17 (1987) (discussing concept that where safety device is rendered inoperable manufacturer is not liable). To the same effect are *Jones v. Ryobi, Ltd.,* 37 F.3d 423 (8th Cir.1994) (safety guard and interlocking switch on printing press disabled); *Davis v. Berwind Corp.,* 433 Pa.Super. 342, 640 A.2d 1289 (1994) (removal of interlocking safety device on meat blender that prevented discharge doors from opening if operator's hands not on machine); and *Smith v. Hobart Mfg. Co.,* 302 F.2d 570 (3rd Cir.1962) (safety guard on meat grinder removed). Some decisions discuss the issue in terms of proximate cause, holding that disabling equipment safety features breaks the chain of causation. *See McNeely v. Harrison,* 138 Ga.App. 310, 226 S.E.2d 112 (1976); *Ford Motor Co. v. Eads,* 224 Tenn. 473, 457 S.W.2d 28 (1970). None of these cases contradicts any reported Arizona authority.

¶ 46 The majority attempts to distinguish *Robinson,* and tries to avoid the whole line of authority it exemplifies, by asserting that the machine furnished by Nissei was defective when it left the factory and could not function as intended unless modified. The assertion that the machine was defective misses the whole point of this line of authority: that equipment "deficiencies" that make a machine less than completely tamper-proof[9] are not chargeable to the manufacturer when tampering by a production-minded owner renders the equipment unsafe. For example, even though the safety guard in *Hobart* was removable with hand tools and was not welded in place, its removal obviated the manufacturer's liability as a matter of law. 302

---

8. While the majority contends that this machine was "defective when it left the manufacturer's control," it is clear that it was only the abuse of the equipment that allowed Anderson's injury to occur.

9. No ANSI standard requires that a safety guard be permanently affixed. The majority's notation that the guard was secured by "three small screws" does not demonstrate a defect.

F.2d at 575.[10]  The assertion that with the guards in place the machine would not function as intended is not only entirely unsupported on this record[11] (Anderson has not even argued it), it is unsupportable.  To say this machine did not function as intended because it had to be stopped to be "dedrooled" makes no more sense than to say that a car does not function because operation has to be stopped periodically to give it gas, oil, and needed maintenance.  The machine made plastic bottles at a certain rate.  There was no evidence that it was supposed to function at a higher rate.

¶ 47 Assuming plaintiff had proven his "drool" theory, it still would have established an unreasonable alteration of the machine by Star Container disabling numerous safety design features in pursuit of a production schedule Star Container itself set, causing serious injury to its employee.  I would affirm the trial court's entry of judgment for the manufacturer.

10.  The majority's claim that Nissei had "actual or constructive notice of the absence of the guard in question" is completely misguided.  Nissei clearly had no information until after the accident that the guards had been removed from the machine that injured Anderson.  At the time of the accident, the machine was in the control of Star Container.  Unless the removal of the guards was "foreseeable" at the time of manufacture, Nissei could not be liable for any abuse by Star Container of the machine.  *Hobart* stands for the proposition that a manufacturer does not have to "foresee" that a subsequent owner of equipment will disable safety features.
    The majority apparently misapprehends the citation in *Hobart* to *Snyder v. Longmead Iron Co.,* 244 Pa. 325, 90 A. 630 (1914).  In *Snyder,* the defendant's actual or constructive notice of the removal of safety guards from the machine in question would have made the defendant liable for the plaintiff's injury because defendant was plaintiff's employer and owned and controlled the equipment.  Neither *Hobart* nor *Snyder* suggests that later knowledge of modifications to a machine after the machine has left the factory could make the machine's manufacturer liable for injuries which could not have occurred but for the modifications.

11.  Again, the majority's factual assertions misstate the evidence: no one testified that having to shut off the machine every fifteen minutes made the machine non-functional.  Further, the machine did not have to be shut off every fifteen minutes to remove drool.  Employees removed drool with a pole.  *Only occasionally,* the machine might shut off when its safety switch engaged.